# WHEELING.

STATE OF WEST VIRGINIA v. WADE H. THOMPSON.

Submitted August 15, 1882— Decided December 16, 1882.

(*WOODS, JUDGE, Absent.)

| | |
|---|---|
| 21 | 741 |
| 38 | 231 |
| 21 | 741 |
| 40 | 721 |
| 21 | 741 |
| 41 | 651 |
| 21 | 741 |
| 42 | 57 |
| 21 | 741 |
| 43 | 677 |
| 43 | 694 |
| 21 | 741 |
| 47 | 126 |
| 21 | 741 |
| 51 | 301 |
| 21 | 741 |
| e53 | 267 |
| 21 | 741 |
| 56 | 313 |
| 21 | 741 |
| j59 | 33 |
| 21 | 741 |
| f62 | 709 |
| 63 | 408 |
| 21 | 741 |
| e64 | 637 |
| 21 | 741 |
| 66 | 202 |

1. A bill of exceptions in a criminal case, upon the refusal of the court to grant a new trial on the ground, that the verdict is contrary to the evidence, certifies all the evidence and all the evidence for the prisoner is in conflict with that of the State so, that it is impossible that both can be true, the appellate court will reject all the evidence of the prisoner and look only to that of the State. (p. 754.)

2. In reviewing the judgment of the court below in such cases, the appellate court will not reverse the judgment of the court below on the ground, that there is a doubt of its correctness; but it must be satisfied that the evidence is plainly insufficient to warrant the verdict. (p. 755.)

3. The courts of this State are peculiarly jealous of any encroachment by the court on the province of the jury, and it is error for a court in the trial of a case, to intimate any opinion in refer-

---

*Case submitted before Judge W. took his seat on the bench.

ence to matters of fact, which might in any degree influence the verdict nor can the court instruct the jury as to the weight to be given by them to the evidence of any witness, whether the witness be impeached or not, or whether he is contradicted as to material facts or not. The jury are the exclusive judges of the weight to be attached to the evidence of any witness, and the court would err in influencing them in any way in determining this weight, either by instruction as to the proper manner of ascertaining such weight, or otherwise. (p. 756.)

4. A court ought not to grant an instruction irrelevant to the case, though as a proposition of law it may be in the abstract right. (p. 760.)

Writ of error to a judgment of the circuit court of the county of Wayne, rendered on the 11th day of July, 1881, upon an indictment for murder against Wade H. Thompson, allowed upon the petition of said Thompson.

Thomas H. Harvey, special judge, rendered the judgment complained of.

Green, Judge, furnishes the following statement of the case:

On March 4, 1878, the grand jury of Wayne county was formed and duly sworn, and on March 6, 1878, found an indictment against Wade H. Thompson, for the murder of Alonzo McCoy on December 18, 1877. He had not been previously arrested, but immediately appeared in person and moved the court to quash the indictment, and also pleaded not guilty, and issue was joined and the case continued.

Two years afterwards, on March 4, 1880, the prisoner Wade H. Thompson was set to the bar in the custody of the sheriff, and the court overruled the motion to quash the indictment and the case was continued. And at a regular term of the court, on June 30, 1881, Ira J. McGinnis, the judge of the court opened the same, and at 12 o'clock the court took a recess till 2 o'clock P. M. of that day. But the judge failed to return to the court-room again at the appointed time to hold and continue said court, and the members of the bar present and practicing in the court, proceeded to elect a judge by ballot, to hold and continue said court during the absence of the judge.

The election was held by the clerk of the court and he declared, that Thomas H. Harvey a practicing attorney of the court, was duly elected as provided for by the statute law. And thereupon he took the several oaths required by law as such judge, and entered upon the discharge of the duties of his office; all of which was entered in the record book of the court. The prisoner, Wade H. Thompson, was set in the bar in the custody of the sheriff of the county, and a jury was elected, tried and sworn to well and truly try and true deliverance make between the State and Wade H. Thompson the prisoner at the bar, whom they should have in charge and a true verdict render according to the evidence. A part of the evidence was heard and the case was regularly and properly continued from day to day, and having been completed and committed to the jury on July 8, 1881, they rendered their verdict as follows: "We the jury agree and find the defendant Wade H. Thompson, guilty of murder in the second degree, as charged in the within indictment, and ascertain and fix his period of confinement in the penitentiary for the period of five years."

The prisoner moved the court to set aside the verdict, as contrary to the law and evidence, for improper conduct on the part of the jurors, and because the jurors were disqualfied. And on the 15th day of July, 1881, no evidence having been offered to sustain the two last named grounds for a new trial, the court overruled the motion for a new trial, and in accordance with the verdict rendered a judgment whereby it sentenced the prisoner to be confined in the penitentiary for five years. From this judgment this Court has awarded a writ of error.

Three bills of exceptions taken during the trial, were signed and sealed by the presiding judge and made a part of the record. The first bill of exception sets out all the evidence in the case, and was an exception to the refusal of the court to grant the prisoner a new trial. The second exception was to the court's permitting, against the objection of the prisoner, five different questions to be propounded to witnesses and their answers, to go as evidence to the jury. What is deemed necessary to state in reference to these questions and answers, will be stated in the opinion. The last exception

was to instructions given and refused by the court and was as follows:

## INSTRUCTION No. 3.

" The court instructs the jury that if they are satisfied from the evidence that William Patterson, Esther Patterson, Harvey Patterson, Alfred Allen, Moses Hunt and Rebecca Hunt, witnesses for the State, or either or any of them, have or has willfully and knowingly swore falsely as to any fact or matter material to the issue involved in this case, that the jury are to disregard each and every other material fact sworn to on this trial by each and every of the said witnesses whom they are so satisfied have sworn falsely as aforesaid, except so far as they may be further satisfied from the evidence that the other material fact or facts so sworn to by each witness or witnesses has or have been corroborated by other creditable evidence in the case."

## INSTRUCTION No. 5.

" The court instructs the jury that if they are satisfied from the evidence that the deceased, Alonzo McCoy, had shot one Moses Hunt jr., shortly before his death, and that the said Hunt complained of such shooting to and in the presence of the several persons named by the witness, Rebecca Hunt, and William Fortner, at the house of John Thompson, and desired them to arrest said McCoy therefor, and that the said persons so complained to had come to believe and did believe that the said McCoy had been and was guilty of a felony in and by such shooting, and that in pursuance of such request and belief they went to the house of William Patterson for the sole purpose of arresting said McCoy without a warrant issued by any officer for that purpose, that the said persons, and each of them, had the right under the law to arrest the said McCoy for the said offense so charged against him, although they had no warrant or authority for making such arrest except the general authority which the law gave them."

## INSTRUCTION No. 6.

" The court instructs the jury that the evidence in this case is not sufficient in law to authorize them to presume or find that the prisoner, Wade Thompson, conspired with others to murder Alonzo McCoy."

## INSTRUCTION No. 8.

"The court instructs the jury that if they believe from the evidence that the witness, William Patterson, was a witness before the grand jury and testified against the prisoner and others in relation to the charge contained in this indictment, and that the evidence he gave before the grand jury as to said charge was and is materially different in any material matter connected therewith from the evidence he gave on this trial or to the same matters, and if they further believe from the evidence that the said Patterson gave evidence on the former trial of this case, or made statements out of court relating to the issues in this case, materially different to what he has sworn to on this trial, and that he was interrogated as to such evidence and statements on this trial and denied having made them, or to have so sworn differently, and if they further believe from the evidence that the said Patterson has, in his evidence on this trial, made false and contradictory statements as to any matter or matters material to the issue in this case, that then and in that event the jury are to take in consideration all such evidence, statements and contradictions in determining the degree of credit to be given to the evidence of said Patterson on this trial. And if they believe therefrom, or from any other evidence given by him or others on this trial, that he is unworthy of credit, they have the right to disregard his evidence in this trial."

## INSTRUCTION No 9.

"The court instructs the jury that if they believe from the evidence that the witnesses, Esther Patterson, Harvey Patterson, Alfred Allen and Rebecca Hunt, were sworn and examined as witnesses for the State on the former trial of this case, and that they, or any of them, testified on that trial, or to any matter or fact material to the issue in this case, differently from the evidence given by them, or either of them, in relation to the same matter or fact on this trial, and that they, or any of them, have made contradictory statements in their evidence in this case in relation to any matter or fact material to the issue in this cause on this trial, then and in that event the jury are to consider such contradictory statements and evidence in determining the degree of credit to be

given to any such witness. And if they believe from such evidence, and from any other evidence in this case, that any such witness is unworthy of belief, they may disregard his or her evidence."

### INSTRUCTION No. 10.

"If in endeavoring to arrest a felon some one of a party should kill.him, it will be neither murder nor manslaughter in others who were along and who did not participate in the killing."

### INSTRUCTION No. 11.

"If one goes with others to arrest a man charged with felony, he is not responsible for any malicious or wrongful intent of the others."

### INSTRUCTION No. 12.

"If the jury believe from the evidence that the prisoner went with others to arrest Alonzo McCoy, and whilst so arresting or attempting to arrest him, the deceased attempted to escape, and some one of the party other than this prisoner fired and killed him, they shall find the prisoner not guilty, unless they are satisfied from the evidence that the prisoner had also conspired with the others to do the deed."

### INSTRUCTION No. 14.

"If the jury believe from the evidence that the prisoner was attempting to arrest a man charged with a felony in a lawful manner, and killed him without intending to do so or to hurt him, then they shall find him not guilty.

"Which the court refused to give, and in lieu of 3, 5 and 8 gave the following instructions—that is to say :"

### INSTRUCTION No. 3.

"If the jury believe from the evidence that any witness who has testified in this case has knowingly and willfully testified falsely to any material fact in this case, they may disregard the whole testimony of such witness, or they may give such weight to the evidence of such witness on other points as they may think it entitled to. The jury are the exclusive judges of the weight of the testimony.

"To which ruling of the court in refusing said instructions and giving in lieu thereof the others, the prisoner excepted and tendered his bill of exceptions, and which he prays might

be signed, sealed and made a part of the record in this case, and the same is accordingly done."

The evidence set out in bill of exceptions No. 1 proved the following facts: That on the 17th day of December, 1877, Wade H. Thompson had a barn-raising at his house, and there were some twenty persons there the greater part of the day and they were drinking, but to no great excess. Among those who were there on that day, were John Thompson, Mart Thompson, Bill Fortner, John Wilson and Moses Hunt. John Thompson left and went to his own house, probably a half mile off, and came back to the top of the hill and hollowed, that McCoy had shot Moses Hunt's son, and he wanted them to come up and help take him. He said too, that McCoy would take or had taken his horse that night, and he would follow McCoy to hell or have him. Wade H. Thompson and a number of persons went over to John Thompson's house.

There is a considerable diversity in the statement of the witness, as to whom of those who were at Wade H. Thompson's, went over to his brother, John Thompson's; but they all agree, that Wade H. Thompson went with them. When they reached there it was found, that young Hunt was there and wounded to some extent in the thigh, probably not severely, but to what extent does not appear. The only evidence given as to how he was shot, was given by the brother-in-law of Alonzo McCoy, and he says, that on that day McCoy shot at the horse on which young Hunt was riding; why he did so he does not know as they had had no quarrel. On the second shot, young Hunt was struck in the thigh by the ball accidentally. McCoy and his brother-in-law were together. McCoy lived a short distance across the Kentucky line, but was then at his brother-in-law's in West Virginia, a few miles from Thompson's.

Some witnesses state, that John Thompson proposed that the party should at once start and find McCoy and arrest him; and some of the party objected as there was no warrant for his arrest. But the mother of young Hunt, who had been shot, and was there says, John Thompson whispered to her that he intended to shoot his damn brains out. While another of the party said, they were going to arrest

McCoy, and he did not want him to shoot his eye out. The whole party before starting, armed themselves with rifles, guns and pistols. They went to William Patterson's, a brother-in-law of Alonzo McCoy, and according to the statement of Esther Patterson, the wife of William Patterson, and their son Harvey Patterson, the party came into the house of Patterson, some by the front door and others by breaking in the back door. William Patterson and Alonzo McCoy, the brother of Mrs. Patterson, were not in, and they did not tell Mrs. Patterson what they wanted; only enquired where William Patterson her husband, and her brother Alonzo McCoy was. She told them, that she did not know. They were at that time, down at Powder Mill creek, a short distance from the house on a flat-boat, where there was music and dancing. After awhile they returned, and as they approached the house were heard talking; when the whole party went out of the house and according to the testimony of William Patterson, Esther Patterson and Harvey Patterson, all of whom witnessed the scene, they all without saying a word, opened fire on McCoy without any attempt at his arrest, whereupon he fled; they pursued him, continuing to fire upon him and in running got up within probably twenty yards of him, when he hollowed, that he was shot. William Patterson and his wife, then went to where he was and found that he was badly shot and removed him to their house, and sent for a doctor. McCoy died the next day in Wayne county, West Virginia, of the wounds he had received.

The only defense offered by the prisoner was an attempt to prove, that he was not one of the party, who went to William Patterson's that night, but that he refused to go with the party, and returned from his brother John Thompson's to his own home before the party started after McCoy. The evidence would seem to establish beyond dispute or controversy, that all of the party who went in pursuit of McCoy, were guilty of his murder. The evidence on the part of the commonwealth tends to prove, that Wade H. Thompson was one of the party, and engaged in pursuing and firing on McCoy. The witnesses were Esther Patterson and Harvey Patterson, and they had a good opportunity of knowing whether he was one of the party or not. They knew him

quite well, and he was for sometime, how long does not appear, in the house and according to their statement there was a good light in the room made of pine. Their statement as to Wade H. Thompson being one of the party, and actually firing on McCoy as he ran, is corroborated by William Patterson, who was with McCoy and when they opened fire he stepped to the right and McCoy ran to the left, and they all pursued him till passing near Patterson's, McCoy was shot down. It was a bright moonlight night, and he was probably within twenty or thirty yards of them, and knew Wade H. Thompson quite well. The statement of these witnesses, that Wade H. Thompson was one of the party is corroborated also by Moses Hunt sr., the father of the young man whom McCoy shot. He states, that the day after McCoy was shot, he asked Wade H. Thompson "How far did you boys shoot at Lon. McCoy last night? He replied, "By God about as far as from here to that stump. By God he just fell as dead as a beef shot down." The stump he referred to was six or seven yards off. And also by his wife Rebecca Hunt, who was at the house of John Patterson with her son, who was then wounded, when the party left there to go to William Patterson's house in search of McCoy. He Wade H. Thompson, came back with others to John Thompson's house. She asked him on his return, what was done and he said, "We have killed him as dead as hell, and you fellows have got to swear us out of it." She is the witness who testified, that John Thompson said before they left, that "he intended to shoot his damn brains out."

In opposition to this however, the prisoner proved by six witnesses beside himself, that he was not with the party who went to William Patterson's house that night; but that after going up to the house of his brother, John Thompson's, he returned to his own house and staid there all night. Some of them say, that he and others refused to go with the party who went to William Patterson's house, because they had no warrant to arrest McCoy. And that Wade H. Thompson, before they left John Thompson's to arrest McCoy, left there with some others and went home.

Thus the statements of the witnesses for the commonwealth and the witnesses for the prisoner, were in irrecon-

cilable conflict; and one or the other must be regarded as intentionally false. In such case, whether the prisoner was or was not guilty, depended solely on whether the witnesses for the commonwealth or the witnesses for the prisoner told the truth. The verdict of the jury was entirely dependent on the credit they attached to the testimony of the different witnesses.

The petition for the writ of error, refers at length to different portions of the testimony, which it insists destroys the credibility of the witnesses for the State. The three witnesses present at the murder all state, that the party engaged in it were six in number, all of whom they distinctly recognized except one dressed in blue, whom they took to be the father of young Hunt, who was shot. There does not appear to be any reason why they could not recognize him, as readily as any of the others; and if what they say is true it is certainly remarkable, that they all thus failed to recognize him clearly. Esther Patterson says, she thought when she opened the front door, she recognized the three who came in that way, though she does not say she certainly knew who they were; but this does not appear to be inconsistent with her statement, that she knew well who the party were except one of them, as she had a good opportunity of afterwards recognizing them, when they were in the room with her in which there was a good light. She speaks confidently of the prisoner being one of the party. But there was some diversity in the statements of these three witnesses as to how Wade H. Thompson was equipped and armed. Young Patterson, a boy then about thirteen years old, said at first, that he had a gun, and afterwards said he had no gun, but had a pistol and a pair of saddle bags on his shoulder. His father says, that he had a gun and pistol, and after firing his gun took his pistol out of his saddle-bags. These three witnesses, the father, mother and son, say, that the entire party ran after McCoy when he fled, firing upon him repeatedly; while the evidence shows, that one of the persons whom they recognized as one of the party, had a stiff knee and could not run much faster than a quick walk.

There were also some other slight variations in the statements of these witnesses. Two of the grand jurors testified,

that Wm. Patterson, before them swore to these six men being of the party, and also some others not named. But another grand juror thought, that he spoke of these six men as of the party, but does not say he spoke of any others as of the party. Wm. Patterson admits, that one of this party who owed him nothing, handed him an envelope which contained seventy dollars, and that he Patterson used the money. He also says, that the prisoner offered him five hundred dollars not to testify. This the prisoner denied. The parents of young Hunt corroborate the State's three witnesses in their statement, that the prisoner was one of the party who murdered McCoy. The father's testimony is weakened by the fact, that the commonwealth's three witnesses all thought that he was one of the party who murdered McCoy, though they did not identify him certainly, and he was indicted and the indictment was dismissed. He denied that he was present. His testimony is further weakened by its being testified, that he told a witness he did not believe that the prisoner knew anything about the murder. His character too, as well as that of his wife for veracity, was assailed; four witnesses who lived near him when in Kentucky, saying, that they were not worthy of belief on oath. But as to whether these four witnesses can be relied on as competent witnesses to testify on such a subject, is questionable. One was the prisoner's nephew, and another was a brother-in-law of this nephew, and a third left Kentucky under a charge of sheep stealing. Certainly if the charcter of the Hunts for veracity, was bad in the neigborhood in Kentucky where they lived, the prisoner could have got less exceptionable witnesses to testify to their bad character for veracity.

While therefore the testimony of the State was given by witnesses, who to a greater or less extent may be regarded as unreliable, yet on the other hand the testimony of the witness for the prisoner, whereby he proved an alibi, is also certainly suspicious and may well not have been believed by the jury. There were no less than seven of them, but their testimony differed in material matters of fact about which, if they were all telling the truth, it would be very strange that they should so differ. All of them agree, that the prisoner when called by his brother John Thompson, went with others over to his

house, and in a time varying from a half hour to two or three hours, returned to his home and staid there all night; which if true of course proves, that he was not of the party who went to Wm. Patterson's from John Thompson's and murdered McCoy that night. But this is about all in which they do agree. Thus one of them says, he came back alone from his brother John Thompson's. He states the names of others who went over with him, but he says none of them came back to Wade H. Thompson's excepting Wade H. Thompson himself. Six others say, that Wade H. Thompson came back with one, some two and others three, giving the names of them; then, two of them thus named, were testified to by the State's witnesses as being at that time at Wm. Patterson's, engaged in the pursuit of McCoy. Some of them were persons who went over with Wade Thompson to his brother's; and it is strange if speaking the truth, that they do not agree as to who came back, and who among them staid all night at Wade H. Thompson's. Several of these witnesses occupied relations to the prisoner and to the case, that tended to weaken their testimony. One was the prisoner himself, another was his brother, John Thompson, who admits that he went to Wm. Patterson's after McCoy, but makes no statement of what occurred there; nor does he state who went with him. Another was the step-mother of the prisoner, a fourth was one of the party whom the State's witnesses testified was present and aiding in the murder of McCoy; and a fifth one was testified to be unworthy of belief on oath, by another of the defendant's witnesses.

The jury by their verdict, appear to have placed more faith in the witnesses for the commonwealth, than in these witnesses for the prisoner. There was other evidence in the case of a not very important character, which I deem it unnecessary to state. What has been stated shows the general character of the case, and is amply sufficient to enable us to determine the relevancy or irrelevancy of certain of the instructions asked by the prisoner and refused by the court, as well as to determine the propriety of the court's refusal to grant a new trial to the prisoner.

A more detailed statement of the case is unnecessary to enable us to understand the opinion of the Court, and this has

been the object of stating it, to the extent to which it has been stated.

*James H. Ferguson* for plaintiff in error cited the following authorities:  17 Gratt. 473, 483, 484; 18 Gratt. 801, 815, 816; *Ward et al. v. Chum.*

*Attorney-General Watts* for the State cited the following authorities:  1 Greenl. Ev. § 49; *Id.* § 111; 23 Gratt. 409; 1 Bish. Cr. Pr. § 979; Whart. Cr. Ev. § 384; Whart. Cr. Pl. & Pr. §§ 710, 714; Archt. Cr. Pr. & Pl.; *Id.* 641, 644; Bish. Cr. Pr. §§ 978, 981; Whart. Cr. Pl. & Pr. § 13; 1 Whart. Cr. Law, § 410: *Id.* 402; 2 Whart. Cr. Law, §§ 1398, 1404.

GREEN, JUDGE, announced the opinion of the Court:

The petition for a writ of error in this case, was founded as I conceive upon serious misconception of the true relations in this State, which exist between a court and a jury in the trial of any case, either civil or criminal.  And also upon a misconception of the grounds on which the Appellate Court in a criminal case, will reverse the judgment of the court below, when a new trial was asked and refused by the court below.  The petition is obviously based on the assumption, that it was the duty of the court below to have awarded a new trial, simply because in its judgment there was a reasonable doubt as to the guilt of the prisoner, and that if this Court can be satisfied that such reasonable doubt exists, that it is the duty of this Court to reverse the judgment of the circuit court and award a new trial.

If such a principle was acted upon by this Court, it would be it seems to me obviously an unjustifiable interference on the part of the Court with the province of the jury, and a dangerous violation of what is the well settled practice of the courts of this State and of Virginia.

In *Grayson's Case*, 6 Gratt. 712, it was decided, that new trials are grantable at the instance of the accused in all criminal cases, and that motions for new trials are governed by the same rules in criminal and in civil cases.  And it was also held in this case, that when the evidence is contradic-

tory and the verdict is against the weight of the evidence, a new trial may be granted by the court which presides at the trial; but its decision is not the subject of a writ of error or *supersedeas*, nor examinable by an appellate court. It seems obvious from the statement we have made in this case, that if this be law no new trial can be properly granted by this Court in this case on its merits, if no errors were committed by the court below in the trial. And yet, the elaborate petition for a writ of error in this case, occupying more than twenty-five manuscript pages, is based principally on the allegation, that the evidence is contradictory and the verdict against the weight of the evidence.

The evidence in this petition is summarized, with a view of establishing these propositions, and if *Grayson's Case*, 6 Gratt. 712, be law, the petition on its face shows, that on this the principal ground relied on, the decision of the circuit court is not subject to be reviewed by this Court; but is final. In full accord with this decision in this respect, is the case of *Vaiden* v. *The Commonwealth*, 12 Gratt. 717, in which the court of appeals decided that, "A bill of exceptions in a criminal case upon the refusal of the court to grant a new trial, on the ground that the verdict is contrary to the evidence, is to be framed in the same way as the bill of exceptions in civil cases to the like refusal is framed. And if the evidence is certified instead of the facts proved, the appellate court will only look at the evidence introduced by the commonwealth."

Now after reviewing the evidence of the commonwealth the petition for a writ of error in this case says, "If the evidence of these witnesses was true, and the killing of McCoy took place as sworn to by them, it was a clear and unmitigated case of willful, malicious, deliberate and premeditated murder as to all concerned in it. It was committed according to this evidence without cause, without provication, without necessity, without any attempt to arrest McCoy for shooting young Moses Hunt, and in a most reckless, savage and unheard of manner." And as the commonwealth's witnesses prove, that the prisoner aided directly and personally in this savage murder, it must according to the case of *Vaiden* v. *The Commonwealth*, 12 Gratt. 717, follow, that had the jury

found a verdict against the prisoner of murder in the first degree, and it had been approved by the circuit court, this Court would not have awarded a new trial, though as in the petition it is insisted that, the defendant's evidence satisfied this Court that the commonwealth's evidence was false and utterly misrepresented the case; for this Court "will only look in such a case, at the evidence introduced by the commonwealth." We cannot in coming to a conclusion, even look at this evidence of the defendant.

In accord with their decisions, this Court held in *Seibright* v. *The State*, 2 W. Va. p. 591, that, " Even if the verdict of the jury, in the opinion of the Appellate Court, has been against the weight of evidence, and the court below has refused a new trial, it would be improper for the Appellate Court to interfere with its decision." These decisions are obviously based on the universally recognized principle in this State, that the jury are the judges of the facts and if upon the facts they have found the defendant guilty, and this finding is approved by the court which presided at the trial, the Appellate Court which labors under the great disadvantage of not hearing and seeing the witnesses testify will never, on a certificate of the evidence, disturb such verdict and judgment, merely because the evidence of the prisoner contradicted that of the commonwealth, if that of the commonwealth justified the verdict. For this Court must presume, that the jury before whom the case was tried, and, the judge who presided at the trial and heard the evidence, properly regarded the evidence of the commonwealth as more trustworthy than that of the prisoner. We cannot set up our judgment as to the credibility of witnesses, against the judgment of the jury and the court below, for their opportunity of reaching a just conclusion as to the reliability of witnesses is far superior to ours. In such a case, the judgment of the court below can only be reversed, for errors of law committed by the court below, in the progress of the case.

It only remains then to enquire whether any such errors were committed. And first, did the court below commit any errors in refusing the prisoner's instructions or any of them, or in granting the instructions it did in lieu of instructions number three, five and eight as the record says, but

which was intended in lieu of numbers three, eight and nine? The third instruction asked by the prisoner, was in effect, that if the jury believed that certain of the commonwealth's witnesses had willfully sworn falsely about any material fact, they were to disregard his evidence altogether as to every other material fact, unless he was in his statement about such other material fact corroborated by other credible evidence in the case. In determining whether this instruction should have been granted, it is necessary for us to have a clear conception of the respective duties and obligations of the court and jury, in the trial of such a case.

In England, as well as in some of the States of this Union, much more latitude is given the judge in such a case, than is given them in Virginia or in this State. In some of the States the rule seems to be, that a judge has a right to express his opinion to the jury on the weight of evidence, and to comment thereon as much as he deems necessary for the course of justice; and an erroneous opinion on matters of fact is no ground for a new trial, unless he goes to the extent of inducing the jury to believe, that he has withdrawn this matter from their consideration. See *Commonwealth* v. *Child,* 10 Pick. 252 and *People* v. *Rathbun,* 21 Wend. 509; *Johnston* v. *Commonwealth,* 85 Pa. St. 54. In this last case it was held, that these words, "I cannot for my part see how the jury can hesitate a moment to convict the prisoner on the third count," were not on the facts, too strong an instruction. A far different rule has always prevailed in Virginia and in West Virginia. Our authorities are reviewed in the case of *State* v. *Hurst,* 11 W. Va. p. 75. It is there said, "In Virginia the courts have always guarded with jealous care the province of the jury." Thus as far back as *Ross* v. *Gill, and wife,* 1 Wash. 88, President Pendleton said, "If the question depends upon the weight of testimony, the jury, and not the court, are exclusively and uncontrollably the judge * * * and Judge Moncure in *McDowell Ex'rs* v. *Crawford,* 11 Gratt. 405, as a result of the conclusion of a review of the cases this language is used: 'They evince a jealous care to watch over and protect the legitimate powers of the jury. They show, that the court must be very careful not to overstep the line which separates law from fact. They estab-

lish the doctrine, that when the evidence is *parol*, any opinion as to the *weight, effect* or *sufficiency* of the evidence submitted to the jury, any assumption of a fact as *found*, or even an intimation that written evidence states matters, which it does not state, will be an invasion of the province of the jury.' * * * If the province of a jury should be thus guarded with jealous care in a civil case, much more and for stronger reasons, should it be watched, guarded and protected in a criminal case."

In that case, upon it being reported to the court by one of the jurors the others being present in court, that he thought the jury could not agree, the judge said to him in the presence of the jury, "I see no reason why the jury cannot agree upon a verdict in this cause," and directed the jury to return. The jury found the prisoner guilty, and this Court deemed this a sufficient reason to set aside the judgment and verdict and award a new trial. This case shows the marked difference between this Court and the court of appeals in Virginia on the one hand, and some of the appellate courts of some of the other States in regard to the care, which is exercised to guard the province of the jury from being interfered with by the court.

In the case of the *State* v. *Betsall*, 11 W. Va. p. 704, it was decided by this Court, that "a conviction may be had on the uncorroborated testimony of an accomplice, and in such case, if the judge who presided at the trial is satisfied with the verdict and refuses to set it aside, the Appellate Court will not reverse the judgment and set aside the verdict on the ground, that it rested solely on the uncorroborated testimony of an accomplice." This conclusion is based on the fact, that the jury are the sole judges of the credibility of all admissible testimony; and in this State the court would err in advising the jury not to convict on the uncorroborated evidence of an accomplice, though this is the common practice in England and in some of the States. But it is utterly opposed to the practice in this State or in Virginia. On page 740–741, 11 W. Va. R., this Court says, "Our courts are somewhat peculiar in this respect; but the law has been so held in Virginia from the earliest history of her jurisprudence; and we think it constitutes one of the brightest ornaments thereof."

And on page 743 this Court says, "When the jury has found the defendant guilty in a criminal case, and a motion to set aside a verdict and grant a new trial on the ground, that the evidence is insufficient to sustain the verdict, the appellate court will not set aside the verdict and grant a new trial, unless it is irresistibly clear that the conviction was wrong."

Upon these authorities it seems to be clear, that the circuit court would have erred in instructing the jury that they were to disregard any material fact sworn to by any competent witness, whether corroborated or not, because the jury believed that the witness had sworn falsely to any other material fact. It was the exclusive province of the jury to weigh the evidence of every witness, and to give to it whatever weight they deemed it entitled; and the court properly in this case, declined by this and other instructions asked, to interfere by the expression of any opinion or views on the weight of the evidence, or as to the manner in which it was to be weighed.

The third instruction asked by the prisoner was properly refused. The instruction given by the court in lieu of instructions three, five and eight meaning the third, eighth and ninth was, "that the jury might disregard entirely the testimony of a witness, who had knowingly and willfully testified falsely as to any material fact; or they might give such weight to his evidence on other points as they might think it entitled to, and that the jury were the exclusive judges of the testimony. This instruction is unobjectionable, and it was very properly substituted for the prisoner's instructions number three, eight and nine, which were well calculated to mislead the jury; and were encroachments on their province. Ought instruction number five for which, it was by mistake said to be substituted, to have been given? This instruction it seems to me ought not to have been given. I apprehend, that it does not even as an abstract question of law propound the law correctly, but be this as it may, it undertakes to instruct the jury under what circumstances private persons have a right to arrest suspected felons. Now there was not a particle of evidence in this case to prove, that McCoy was shot by the prisoner and others while they were attempting to arrest him, or that they made any sort of an attempt to

arrest him; and therefore any instruction with reference to the right of the prisoner or others to arrest him, was irrelevant and calculated to mislead the jury and was properly refused on this account.

The sixth instruction was also properly rejected for the reason, that it was irrelevant to the case and calculated to mislead the jury, as well as unsound law. The prisoner was not charged, nor did the State seek to hold him responsible in any manner, for the murder of McCoy, because he had previously conspired with others to murder him. Both the charge and the proof on the part of the State was, that the prisoner personally murdered McCoy, and it was theretor immaterial and foreign to the case for the jury to determine, whether the prisoner had or had not previously conspired with others to murder him; and the court properly declined to say, whether the evidence was or was not sufficient in law to authorize them to presume or find, that the prisoner had entered into such a conspiracy. Had the instruction asked been relevant, it ought on its merits to have been refused.

From the views we have expressed it follows, that all that was proper in instructions number eight and number nine was given in a much clearer manner by the court in the instruction it did give. Instructions numbers ten, eleven, twelve and fourteen asked by the prisoner, are all properly refused by the court. For it is obvious from the statement of the case we have made, that they were entirely irrelevant to the case, there being in the case no evidence tending in any degree to establish any of the supposed cases on which their several instructions were based. They were mere abstract questions of law, and whether they correctly propounded the abstract law or not, as they were entirely irrelevant to the case, they were properly rejected. The granting of any of them, if it did not mislead the jury, could only have distracted their attention from the real case before them, and the court therefore properly rejected each of them.

The truth is as the statement of the case shows, that there were really no questions of law involved in the trial, but simply questions of fact, not even conclusions of facts to be drawn from other facts, but only whether the the facts clearly proven by the witnesses of the State were really facts, or mere

false statements. This depended on the credibility of the witnesses of the State. For if what they said was true, what was testified to by the witnesses for the prisoner was necessarily false. It was a pure question of fact depending entirely on the credibility of witnesses, and of course this Court in such a case could not reverse the verdict of a jury approved by the court below. There was not a particle of evidence tending to show, that McCoy was shot by persons who were attempting to arrest him for a supposed felony. And all the instructions which are based on such supposed cases, were entirely irrelevant and properly refused.

It only now remains to determine, whether the court below erred in permitting testimony to go before the jury against the prisoner's protest, which was illegal testimony. While an exception of this sort was taken, it was not assigned as an error in the petition for a writ of error by the prisoner, nor has it in argument been insisted on before this Court. The dying declarations of McCoy were properly admitted as it was proven, that when made he expected quickly to die. One question was objected to as leading, but it seems to me it was not liable to the objection and it was properly permitted to be answered. The objection to the proof going to the jury, that John Thompson hollowed to his brother and friends from the hill between their houses, to get their horses and come over, that McCoy had taken his horse and he would take him or ride through hell, as well as the statement made by Mrs Hunt, that one of the party going over to Patterson's in search of McCoy called at his house and got a gun and loaded it, while others were hunting him up, was properly overruled by the court, they being evidently parts of the *res gestae* proper to go to the jury. I conclude therefore, that there was no error in the judgement of the circuit court of July 1, 1881, and that it must be approved and the State recover of the defendant in error its costs in this Court expended and thirty dollars damages.

THE OTHER JUDGES CONCURRED.

JUDGMENT AFFIRMED.