# CHARLESTON.

## STATE *v.* PERRY.

Submitted January 29, 1896—Decided March, 18, 1896.

1. EVIDENCE—EXPERT MEDICAL TESTIMONY—HALLUCINATION.
    Whether criminal charges preferred by a female patient against a physician are the result of hallucination, while under the influence of chloroform and ether, is a question that must be determined by expert medical evidence, as it is not a matter of ordinary human experience or knowledge.

2. EVIDENCE—EXPERT MEDICAL TESTIMONY—CONFLICT OF EVIDENCE.
    If such testimony establishes the probability of such hallucination, and such charges depend entirely on the uncorroborated

and contradicted testimony of such patient, the jury should acquit the prisoner.

3. Evidence—Expert Medical Testimony.

Whether a person with a wooden leg is incapacitated from kneeling, and thereby rendered incapable of commiting an offense in the manner charged, is a subject-matter of inquiry, justifying the introduction of expert medical testimony, to assist the jury in arriving at a correct conclusion.

4. Instructions—Witness.

It is error for the court to refuse to instruct the jury that, if they believe the testimony of a witness on any material point is untrue, they are at liberty to disregard her whole testimony.

5. Instructions—Witness.

It is error for the court to refuse to instruct the jury that it is their duty to scrutinize with care and caution the uncorroborated and contradicted testimony of a witness.

D. B. Lucas and George Baylor for plaintiff in error. D. B. Lucas cited 36 W. Va. 292, Syl. pt. 5; Thompson, Trials, § 696; 2 Gratt. 344; 2 Rand. 242; Rogers, Ex. Test. pp. 67, 80, 81, 79, 155, 446; 33 Mich. 113, 120; 11 W. Va. 122, 133, 703, 741; Strumbell, Text-Book of Medicine 759; 2 Greenl. Ev. § 380-81; 39 W. Va. 415; 1 Whart. & Stille Med. Jur. § 273, note; 2 Id. 895; 3 Id. 895; 12 Gratt. 717; 41 W. Va. 407; Wood's Therapeutics (7th Ed.) 152; Lyman on Anæsthetics, 92, 98; 2 Beck's Med. Jur. 918; 2 Elwell, Malp. & Med. Jur. 335.

Forrest W. Brown for defendant in error, cited Rogers, Ex. Test. pp. 33, 36, 68, 81, 91; 2 Bish. Cr. Proc. § 970; Tay. Med. Jur. 630, 669, 671, 782; Tay. Ev. § 58; 1 Redf. Wills 103; 18 Am. & Eng. Enc. Law, 425; 2 Bish. Cr. Law (7th Ed.) § 1126; Whart. & Stille, Med. Jur. (2nd Ed.) §§ 443-59; 20 S. W. Rep. 461; 52 Ala. 395; 2 Gratt. 18; 1 Wash. 88; 11 Gratt. 405; 33 Mich. 112; 83 N. Y. 464; 118 Mass. 420; 76 Pa. St. 340; 11 So. Rep. 256; 38 W. Va. 59; 11 W. Va. 703, 704, 740, 743; 36 W. Va. 691; 16 W. Va. 308; 12 W. Va. 116; 35 W. Va. 272, 277, 278, 279, 318, 682; 12 W. Va. 103; 26 W. Va. 338; 21 W. Va. 741, 756; 31 W. Va. 442, 493, 672; 37 W. Va. 525.

Attorney-General T. S. Riley for defendant in error, cited 59 N. W. Rep. 481; 112 Mo. 277; 33 Pac. Rep. 217;

30 Pac. Rep. 853; 89 Mo. 591; 82 Va. 107; 134 Ind. 651; 98
Ind. 96; 61 N. W. Rep. 186; 136 Ind. 634; 39 Neb. 252-7;
35 W. Va. 272-3; 11 W. Va. 78, 703, 741; 31 W. Va. 674;
24 N. W. L. 852, 12; 42 Neb. 371; Rogers, Ex. Test. 81,
91-2; 39 W. Va. 415; 38 W. Va. 727; 34 W. Va. 38.

DENT, JUDGE:

William E. Perry, a practicing physician, was on the 29th
day of July, 1895, sentenced to confinement in the peniten-
tiary of this state for a term of fourteen years, by the Cir-
cuit Court of Jefferson county, on the verdict of a jury find-
ing him guilty of rape on one Rosa J. Johnston. From
the judgment of the circuit court, he obtained a writ of error,
and now here relies upon numerous alleged erroneous rul-
ings made by the court during the progress of the trial.

The major portion of the facts in the case are undisput-
ed, and are as follows, to wit:   Rosa J. Johnston, a single,
unmarried woman, twenty three years of age, residing in
Halltown, Jefferson county, being sick, and suffering with
pain in back, stomach, and head, on the 12th day of March,
1895, about 12:30 p. m., went to the office of the prisoner,
to consult him and obtain medical relief. She found him
at home, was shown into his office, and, after he had attend-
ed to some other matters, he administered to her a mixture of
chloroform and ether, which deprived her of consciousness
for a short time. The prisoner is a middle-aged man, mar-
ried, has two children, and his house and office join near
the public road, so that passers-by can see in the window of
the office; one door in the office, which opens on to the
porch, communicating with the house. This door was
closed. The windows were up; one in front of office, and
one in rear, so that a person could see clear through the
office. The wife of the prisoner was upstairs in the house,
lying down. In a few minutes she arose, went down to
the office door, saw the prosecuting witness sitting by the
window, and asked if she might come in. Receiving an
affirmative answer, she went in, and talked a while. The
doctor gave the witness a bottle of medicine. She took it
without complaint; went to her dressmaker's; tried on a
new dress, went from there home; complained to her

mother that the doctor had mistreated her. Her mother sent for a physician, who could find no evidence of mistreatment after careful examination, except a slight scratch on the vestibule of the vulva, which might have been done by the witness herself.

The doctor has a wooden leg, which according to the testimony, renders it physically impossible for him to kneel. There were numerous other undisputed facts which have no bearing on the guilt or innocence of the prisoner, and hence it is unnecessary to repeat them.

The matters in dispute, and on the truth or falsity of which this case depends, are as follows, to wit: The prosecuting witness states: "My chair was then by the window. He [the doctor] pulled it away from the window behind the door. Said he was going to give me something to help my head and stomach. I asked him if it was chloroform. Said he could not give me chloroform on account of my heart. I put it to my nose, and found it was chloroform, and I pushed it away. He handed it to me. I told him I was not going to take it. He made me take it. He held me, and put it to my mouth and nose. He put the glass to my mouth and nose. He was holding my hands and making me take it. Handkerchief was in the glass at the time. The last I remember he was pinching my hand, and asking me if I felt that. I did not reply. I came to, and found him insulting me. I was pulled half-way down the chair. My hat was off, and my hair was down. My clothes were up. He was between my legs. Clothes up to waist. He was down on his knees; looked like it to me. After he found out I was coming to, he tried to give it to me a second time. He had it in a glass. Suppose it was on the floor. He tried to put it up a second time, and I pushed it away; and his wife came in just then; that is, she came to the door. He was insulting me when I came to. He had his pants open. I saw his person. He was working up and down. He tried some to penetrate me. His person was in my person when I came to, and found him in this position. I did not do anything. I was so weak and sick. His wife came to the door when he was trying to give me the chloroform the

second time, and tried to open it. The door was locked. I know it was locked, because she tried to get in. He then pulled my clothes down and tried to button his pants. Then he let her in. He did not button all the way up. Don't know how many buttons he had unbuttoned. Think he had his coat off when he gave me the chloroform. I saw his privates when he got out from between my legs. He had his privates in my privates; that is they were part way in me when he got up. Before his wife came in, he pulled me back to window. He pulled my clothes down (first). His wife was on the porch, I suppose; and he wanted to pull my chair to the window, and I told him to go away and leave me alone. This was after he had pulled my clothes down. His wife came in and spoke to me. He opened the door. Doctor said: "I have had Miss Rose asleep, and I have been over to the table writing. I thought you had laid down to take a nap.'"

In contradiction of this statement, the prisoner testifies: "I took up glass and poured some chloroform and ether into it. Gave Miss Johnston to inhale. I said, 'Hold it close to your nose, or you won't get any benefit from it.' I then stepped over to the table, and was looking over my daybook, which might have taken four or five minutes, may be longer. When I turned around, I saw Miss Rose lying back in the chair, with the glass in her hand. I thought she would drop the glass. I stepped up, caught hold of her shoulder, and shook her. Said to her, 'I had no idea I had given you enough to put you asleep.' She seemed to be unconscious still to a great extent. Do not know how long she was under the influence. I then went out on the porch, and called the colored girl, who was sitting opposite the office door, and asked her to get me a glass of water. She was just outside the door when I told her. She went to get the glass of water, and I followed to the back steps, and met her coming up. I took the water into the office, and asked Miss Rose to take some of it. She said, 'No, I feel all right now.' Wife started to come in then. I heard her voice at the window, asking if she might come in. I opened the door, and said, 'Walk in.' She came in; remained there from ten to fifteen minutes.

I deny the statement positively made by Miss Rose that I outraged her. I have a wooden leg, amputated below the knee, and it is physically impossible for me to get on my knees. Deny the statement positively of my mistreating or illtreating her. I gave her the chloroform and ether to relieve her present condition. That is the usual remedy, but it is not given to insensibility."

These were the only two persons in a position to know what took place at the time of the alleged offense; and as to what did take place the prosecuting witness stands wholly uncorroborated. There is some evidence, of a very unsatisfactory nature, tending to show that spermatozoa was found on a garment worn by the prosecutrix at the time of the offense, by one Dr. Edwards, an inexperienced physician, in an examination made by him about the time of the trial, although his evidence is discredited by that of older and more experienced physicians. But granting the truth of the presence of such spermatozoa, yet there is nothing but mere supposition to connect the prisoner with it, as there is no evidence in the case either proving or tending to prove seminal emission on his part. On the contrary, the only evidence touching the matter precludes such emission. The prosecutrix testifies that, when she came to, the prisoner was working up and down, and trying to penetrate her—and, when he found that she was coming to, tried again to administer the chloroform and ether to her; thus showing failure to acomplish his purpose. Her sister testified that some two or three hours afterwards, she noticed two or three wet spots on the tail of the garment she wore; but there is no evidence that such wet spots were of a seminal nature. It therefore seems to me that this evidence of Dr. Edwards was so remote that it should not have been allowed to go to the jury, in the absence of any evidence of seminal emission.

The theory of the defense is that the statement made by the prosecutrix as to what occurred, in so far as contradicted by the prisoner, is the result of hallucination occasioned by the use of the chloroform and ether. This, then, being a question outside the pale of ordinary human knowledge and experience, can not be otherwise determined than by

the testimony of those who are learned, skilled, and experienced in the use of such anæsthetics. All men know by actual experience, more or less, what wild and fantastic shapes their dreams take when the will is asleep. They also know by observation the false notions and imaginations of insane persons whose wills have been impaired or destroyed by disease. But it is only specialists, with experience, who are able to testify as to the effect of particular drugs on the human system. And, when questions of this kind arise, the courts must necessarily turn to such specialists for information coming within the sphere of their particular callings. And, if such testimony should establish the fact that the contradicted statements of the prosecutrix might be the result of hallucination produced by the use of the combination of chloroform and ether, it should not only raise a reasonable doubt in the minds of the jury as to the prisoner's guilt, and thus secure his acquittal, but, taken in connection with the enormity of the crime charged, and its improbability on account of the attending circumstances—to wit, a family physician, married, with a wife in good health and at his command, in his office, adjacent to his home, at high noon, with windows open, and patrons coming and going, a young lady patient, of irreproachable character, confiding in his skill, his integrity and honor, her after conduct, his own good name and fame, and the happiness of himself, his wife and children, at stake, and with no other motive but insatiable lust, which could be satisfied morally, legally, and much more acceptably, without risk or danger, by the means already subject to his demand, and its impossibility on account of his physical condition—should also establish his innocence beyond all reasonable doubt or the shadow of suspicion, except it be in the breast of those whose wicked indulgences have rendered them incapable of appreciating anything pure or virtuous in human conduct or life. Nor should such conclusions, honestly reached, disparage to any extent the virtue or veracity of the prosecutrix, as it leaves no room to doubt but what she was under the influence of a force over which she had no control, and was powerless to resist, and which led her to believe that the vagaries of her unfettered imagination were the happenings of real facts.

Therefore, the true question in this case to which the court should have directed the inquiry of the jury was as to whether the charge preferred by the prosecutrix against the prisoner resulted from hallucination occasioned by the use of chloroform and ether combined, and, as a fact placing such possible hallucination beyond all reasonable doubt, to have inquired into the physical inability of the prisoner to have perpetrated the crime in the manner charged. The rulings of the court relating to these matters, and claimed by the prisoner to be erroneous, are contained in his bills of exception Nos. 5, 7, and 10.

No. 5 sets out the following instructions, as asked by the prisoner, and refused by the court, to wit: "The court instructs the jury that if the evidence in this case raises a reasonable doubt in their minds that the charge made by Miss Rose Johnston was superinduced by chloroform and ether taken by her, or by hysteria and nervousness, or by all or any of these, then the jury should acquit the defendant." This is, in effect, equivalent to saying: "If the jury believe from the evidence that it was possible that the charge made by Miss Johnston against the prisoner was caused by hallucination resulting from the use of chloroform and ether, and such possibility raised in the minds of the jury only a reasonable doubt as to the guilt of the prisoner, they should acquit him"—and is nothing more than saying that the prisoner is entitled to the benefit of every reasonable doubt or every reasonable hypothesis inconsistent with his guilt. This is elementary criminal law. The prosecutor urges two objections to this instruction: (1) That it affects the weight of the testimony. This is not apparent from the instructions, and is therefore not tenable. (2) That the charge might be superinduced by the causes named, and yet be true. This is equally untenable, as the instruction excludes the idea of the truth of the charge, but limits it to a false imagination, occasioned by the causes therein named, and as wholly superinduced by such causes, without other foundation in fact. The court erred in not giving this or a similar instruction. The vast preponderance of the expert medical testimony not only establishes the possibility, but the probability, of the

existence of such hallucination, and therefore justifies the giving of such instructions.

Bill of exceptions No. 7 sets forth the following questions, as propounded to an expert witness, Dr. Nicodemus, by the prisoner's counsel, and excluded by the court, to wit: "Supposing chloroform, or chloroform and ether mixed, sufficient to procure unconsciousness, to have been administered to a female patient, and, on coming to, she has charged the physician administering it with having outraged her person; state from your experience, and your knowledge as a physician, whether such statement might or might not be the result of hallucination." The objection to this question urged by the prosecutor is that the evidence does not justify it. "No witness has ever stated in this case that, on coming to, the girl had charged the physician with having outraged her person. Her charge is that, on recovering consciousness, she caught him in the act. At the time of recovery the question assumes that the act had been done. At the time of recovery all the evidence tends to show the act was being committed." The prisoner, on the other hand, insists that the only evidence tending to prove that the physician was in the act of committing the offense at the time of recovery is the testimony of the prosecutrix, uncorroborated, and contradicted by the accused; and that the supposed time of her recovery, including all intervening occurrences, were a continuation of her hallucinations, until the entrance of Mrs. Perry broke off or destroyed her amatory dreams, and restored her consciousness in part, and that she did not fully come to or escape the delusive stimulating or intoxicating effects of the drugs until she reached home, broke down, and informed her mother and sister of her supposed maltreatment, and for the first time made a charge of misconduct on the part of her physician. Under the head of her hallucinations, the prisoner claims her alleged refusal to take the drugs, the forcing them upon her by the physician, her alleged recovery and discovery of his misconduct, the attempt to again administer the drugs, the pulling down of her clothes, the removal of her chair, and the unlocking of the door, and that they are all the result of her wandering

82

imagination, while wholly under the influence of chloroform and ether, until interrupted by the appearance of Mrs. Perry. The prisoner further insists that it is impossible at times for the patient to tell when the hallucination ends and the reality begins, and hence the hallucination is carried into a delusive belief of its truth, to such an extent as to render it impossible to convince the victim of its falsity. Her "coming-to," from the prisoner's standpoint, refers not to the time when she said she recovered and found the prisoner in the commission of the alleged wrong, but when she first made the charge of misconduct, to her mother and sister. Such being the case, the court should not have excluded the question, but should have permitted it to have been answered.

Bill of exceptions No. 10 sets out the following questions, as propounded to Dr. John D. Starry, a practicing physician, and excluded by the court, to wit: "If a female was sitting in rocking chair [then before the jury] in the manner described by the words 'pulled down in the chair,' and a man weighing two hundred and thirty pounds, with one leg amputated just below the knee, and was thereby incapacitated from kneeling, could he get into position in front of the young woman sitting in the rocking chair in such manner as to violate her person?" The objection to this question is that it comes within the rule expressed in *Overby* v. *Railway Co.*, 37 W. Va. 525 (16 S. E. 813) to wit: "When the inquiry relates to a subject which does not require peculiar habits of study, in order to enable a man to understand it the opinion of skilled witnesses is not admissible." The prisoner testifies that he had a wooden leg, which rendered it impossible for him to kneel; and hence it was impossible for him to commit the offense. The witness Dr. Starry testified that he had attended to, and was acquainted with, the prisoner's leg. He was also a physician, fully acquainted with the construction, organism and anatomy of the human system, male and female. Of such had been his peculiar habits of study. The prisoner might have exhibited to the jury his wooden leg, and the manner in which it was fastened to the stump, and thus convinced them of the impossibility to get into position to perpetrate

the wrong charged; but even in such case it would have been proper to supplement such practical exhibition with the testimony of witnesses who had made the human system, including its joints and organs, a subject of peculiar study, such as the jury would be unable to give in the short time allowed them in the examination of the evidence, and thus assist them in arriving at a just conclusion. Such being the law, this evidence was admissible, although the wooden leg was not exhibited, to corroborate the testimony of the prisoner as to his physical inability to commit the offense in the manner charged. *People* v. *Clark*, 33 Mich. 119; 7 Am. & Eng. Enc. Law, 494.

The following four instructions, asked by the prisoner, were refused by the court:

(1) "Should the jury find that, at the time the alleged outrage is claimed to have been committed, the prosecuting witness was under the influence of ether and chloroform, her testimony should be received and weighed with great caution; and if they find that she was shortly afterwards examined by a physician, who found no evidence of defloration or rape, this circumstance (if they so find) is entitled to great weight." This instruction, especially the latter part, invades the province of the jury, who are the sole judges as to the weight of the testimony. *State* v. *Morgan*, 35 W. Va. 273 (13 S. E. 385); *State* v. *Cooper*, 26 W. Va. 338; *State* v. *Thompson*, 21 W. Va. 741; *State* v. *Betsall*, 11 W. Va. 740.

(2) "The court instructs the jury that if they believe from the evidence that the only evidence tending to prove the guilt of the defendant is the testimony of the prosecuting witness, Miss Rose Johnston, and that her testimony on any material point is untrue, then the jury is at liberty to disregard her whole testimony." This instruction leaves the weight of the testimony with the jury, and it is therefore unobjectionable, and should have been given. See *State* v. *Thompson*, above cited.

(3) "The court instructs the jury that if they believe from the evidence in the case that the crime charged against the defendant rests alone on the testimony of the prosecuting witness, Miss Rose Johnston, then they should

scrutinize her testimony with care and caution." In the trial of all felony cases, the jury should scrutinize the testimony of all contradicted and uncorroborated witnesses with care and caution. This instruction propounds a general principle of law, is unobjectionable, and should have been given, as it leaves the weight of the testimony entirely with the jury, and relates only to the proper discharge of the duty they owe to the accused and the state alike.

(4) "The court instructs the jury that if they believe from the evidence of the physician that examined the prosecuting witness on the day the alleged crime is stated to have been committed, and that said witness could find no evidence that any outrage had been committed upon her, then the jury should acquit the defendant." This instruction was properly refused, under the rule laid down in the sixth point of the syllabus in the Case of Morgan cited above, in the following words, to wit: "An instruction should not single out one fact or element of the case, and make the case turn entirely on it, by telling the jury to find according to the hypothesis of that fact or element, ignoring all other material facts or elements."

Bills of exception Nos. 8, 11 and 12 are founded on the refusal of the court to allow the expert witnesses therein named to give specific examples coming under their own observation or in their own practice as evidence in chief. Such evidence might have been proper, on examination by the court, to test the skill or the experience of the expert, or on cross examination, but was improper as matter in chief, and was therefore properly excluded.

Bill of exceptions No. 9 is taken because the court excluded the following question: "Supposing chloroform and ether mixed to have been administered to a female patient to the extent of unconsciousness, and, when she has recovered the power of locomotion, she makes violent gestures of resistance, and subsequently charges that the physician outrages her person, could or could not such impression be the result of hallucination?" There is no evidence in the case tending to prove that the prosecutrix, when she recovered the power of locomotion, made violent gestures of resistance; hence the objection to the question was properly sustained by the court.

Bill of exception No. 13 relates to the refusal of the court to allow the photographs of the prisoner's house and office to be given in evidence until certain human figures and faces were erased therefrom. How the prisoner was prejudiced by the erasure, or how the state would have been prejudiced by its not being made, is not apparent; hence it does not appear that the court erred therein.

Bills of exception Nos. 14, 15 and 16 refer to the discovery of new evidence and surprise on the trial, and, as the case will have to be reversed and remanded, the errors complained of become unimportant.

In addition to the special bills of exception, there are numerous objections noted in the certificate of evidence, as taken and saved during the progress of the trial. In considering the special exceptions, some of these have already been virtually disposed of, and on a new trial of the case, the circuit court will have the opportunity to correct all mistakes and oversights made on the former trial; and therefore it is deemed unnecessary, if in accord with the former rulings of this Court, to take up these objections and exceptions one by one, and dispose of them. The object of a trial is not to convict the innocent, nor acquit the guilty, but to ascertain the truth, and mete out even handed justice in accordance therewith.

The enormity of the charge, and the severity of the punishment, should secure to the accused a fair trial, before an impartial jury, fully and correctly informed of the facts, circumstances, and law of the case; and if it should appear from the examination of the expert medical testimony that the charge preferred against him is the probable result of continuing delusion, arising from hallucination, caused from the use of a mixture of chloroform and ether, and that, owing to a deformity, he is incapitated from committing the wrong in the manner charged, he should be acquitted, and this without any reflection whatever on the purity, veracity or integrity of the prosecuting witness.

For the foregoing reasons the judgment is reversed, the verdict of the jury set aside, and a new trial awarded.