# CHARLESTON.

STATE v. MUSGRAVE.

(BRANNON, JUDGE, *dissenting.*)

Submitted March 11, 1897—Decided November 10, 1897.

1. CRIMINAL LAW—*Instructions—Circumstantial Evidence.*

    In a case where the evidence is entirely circumstantial, it is error in the court to instruct the jury that circumstantial evidence is often more reliable than the direct testimony of eye-witnesses, and that a verdict of guilty in such cases may rest on a surer basis than when rendered upon the testimony of eye-witnesses where memory must be relied upon, and where passions and prejudices may have influenced them, for the reason that it institutes a comparison between the two kinds of evidence mentioned, and instructs the jury as to the comparative weight of circumstantial evidence. (p. 677.)

2. CRIMINAL LAW—*Instructions—Credibility of Witnesses.*

    It is error in the court to instruct the jury that, if they were of the opinion that any witness had willfully and corruptly testified to what was false, they were at liberty to re-

ject all of his testimony that was not corroborated by other testimony, for the reason that said instruction was calculated to mislead the jury, and was equivalent to telling them that, where a witness had sworn falsely in one thing, the remainder of his testimony should have no weight with them unless corroborated, when they had a right to believe any portion of the testimony, whether corroborated or not, and the instruction invades the province of the jury. *Thompson's Case,* 21 W. Va. 741. (p. 677.)

3. EVIDENCE—*Opinion Evidence.*

The opinions of witnesses should never be received in evidence if all the facts can be ascertained and made intelligible to the jury, or if they are such as men in general are capable of comprehending and understanding. (p. 683.)

4. EVIDENCE—*Opinion Evidence—Province of Jury.*

The general rule is that witnesses must testify to facts, and not to opinions. They must only state facts, not draw conclusions or inferences. To do so is to.invade the province of the jury. (p. 689.)

5. EXPERT TESTIMONY.

The object of all questions to experts should be to obtain their opinion as to matters of skill or science which are in controversy, and at the same time to exclude their opinions as to the effect of the evidence in establishing controverted facts. (p. 684.)

6. EXPERT TESTIMONY—*Hypothetical Questions.*

Although an expert may have heard all the testimony in the case, he can not be asked to give his opinion, based merely upon his having heard such testimony in the case, whenever there is a conflict therein, unless the same is hypothetically propounded to him. (p. 684.)

7. EXPERT TESTIMONY—*Hypothetical Questions.*

An expert can not be asked to give his opinion on doubtful facts in the case on trial, which remain to be found by the jury, but a similar case may be hypothetically put to him, based upon the evidence in such case. (p. 688.)

8. EXPERT TESTIMONY—*Admissibility of Expert Testimony.*

Where the inquiry relates to a subject which does not require peculiar habits of study in order to enable a man to understand it, the opinion of skilled or scientific witnesses is not admissible. (p. 687.)

9. EVIDENCE—*Illegal Evidence—Reversal.*

Where illegal evidence is admitted against the objection of a party it will be presumed that it prejudiced such party, and, if it may have prejudiced him, though it be doubtful whether it did or not, it will be cause for the reversal of the judgment; but, if it clearly appear that it could not have

changed the result if it had been excluded, it will not be cause of reversing the judgment. (p. 690.)

Error to Circuit Court, Monongalia County.

Indictment against David Musgrave for murder. From a judgment of conviction, defendant brings error.

*Reversed.*

Okey Johnson and George C. Sturgiss, for plaintiff in error.

Henry H. Pendleton and T. S. Riley, Attorney General, for the State.

English, President :

David Musgrave was, on the 15th day of February, 1895, indicted for the murder of his wife, Emeline Musgrave, by a grand jury of Monongalia County, and on the 26th day of June, 1895, was found guilty of the charge contained in said indictment, and the jury further found that he be punished by confinment in the penitentiary. On the 27th day of June, 1895, the prisoner moved the court to set aside the verdict of the jury, and grant him a new trial, upon the following grounds : (1) Because the verdict was contrary to the law and the evidence in the case ; (2) because the court admitted on the trial improper evidence on behalf of the State ; (3) because the court refused to admit proper evidence offered by the defendant ; (4) because the court misdirected the jury in its instructions to them on behalf of the State, and in refusing to give an instruction asked for by the defendant ; (5) because of misconduct of the jury,—which motion was, on consideration by the court, overruled, and the prisoner excepted, and thereupon the court rendered judgment upon said verdict, and sentenced the prisoner to confinement in the penitentiary for the term of his natural life, and from this judgment the prisoner applied for and obtained a writ of error and supersedeas. Upon this writ of error the case was heard at the January term, 1896, and the judgment of the court below was affirmed. Subsequently a petition for a rehearing of the writ of error was presented and upon consideration was allowed, and at the March special term of this Court, 1897, the case was reargued, and is now before us for considera

tion upon the reargument. During the trial various exceptions were taken to the rulings of the court upon instructions which were allowed and refused, and upon the admission of testimony to the jury, which counsel for the prisoner regarded as improper, and the entire testimony is set forth in a bill of exceptions as part of the record.

The first error assigned and relied on by the plaintiff in error is that the court erred in overruling his motion to quash the indictment. This assignment, however, does not appear to be insisted upon by counsel for the prisoner in their briefs, and, as the indictment appears to conform to the statute, we suppose the motion was made out of abundant caution.

The next assignment of error relates to the form of the oath administered by the jury. The jury was sworn to "well and truly try and true deliverence make between the State of West Virginia and David Musgrave, the prisoner at the bar, whom you shall have in charge, and a true verdict render, according to the evidence, so help you God." It is claimed that they should have been sworn "a true verdict to render according to the law and the evidence." The oath administered was exactly in accordance with the form prescribed. (Matth Cr. Law, p. 253, note); also with the form prescribed in Robinson's Old Forms, and the form used in this case is the one which has been used in felony cases, both in Virginia and in this State, for very many years, and came to us from the English practice, and we should depart with reluctance from those time-honored forms. It is true that in Arkansas the jury, being the judges as well of the law as the facts (as they have been held to be in this State), must be sworn to try the case according to both. The form of the oath, by analogy to the form used in England, being: "You shall well and truly try, and a true deliverance make, between the state of Arkansas and the prisoner at the bar whom you shall have in charge, and a true verdict give according to the law and the evidence, so help you God." *Patterson* v. *State*, 2 Eng. (Ark.) 59. But if we felt at liberty to make an innovation on the time-honored practice which has come down to us from England and the mother state, can we say that the prisoner was prejudiced by the fact that the jury that tried him was not sworn a true verdict

to give according to the law and the evidence? The record clearly shows that this verdict was not given upon the evidence alone, but by applying the law to the evidence. They were instructed as to the law by the court, and in the light of these instructions they found the .prisoner guilty of murder in the first degree as charged in the indictment, and they further found that he be punished by confinement in the penitentiary. This they could not have done without applying the law as they understood it and received it from the court to the facts adduced in evidence before them. I do not, therefore, consider it necessary to change the form of the oath to be administered in a felony case so that they should be sworn to render a true verdict according to law and the evidence.

It is further claimed by the plaintiff in error that the court erred in giving each and everyone of the instructions given for the State, and it is insisted by counsel for the prisoner that the circuit court erred in giving instruction No. 3 asked for by the State, and objected to by the prisoner, which reads as follows: "The court instructs the jury that circumstantial evidence is legal evidence, and in most criminal cases it becomes necessary to resort to circumstantial evidence. Criminal acts are usually performed in secrecy. Evidence should not be discredited because it is circumstantial. It is often more reliable than the direct testimony of eyewitnesses, when it points irresistibly and conclusively to the commisssion by the accused of the crime. A verdict of guilty in such cases may rest upon a surer basis than when rendered upon the testimony of eyewitnesses whose memory must be relied upon, and whose passions and prejudices may have influenced them." It is earnestly contended by counsel for the prisoner that this instruction was erroneous for the reason that it dealt with the weight of the evidence. Now, a review of the testimony in the cause shows that the State rested its case, and asked that the prisoner be convicted entirely upon circumstantial evidence. If David Musgrave committed the deed of which he is accused in the indictment, no eye saw the act committed, and there is no direct evidence in the entire record fixing the crime upon him. Knowing that the State must rely solely upon circumstantial evidence in order to secure a conviction, the attorney for the State

asked the court to give the above instructions to the jury; and, while the instruction purports to draw a comparison between the weight of circumstantial and direct evidence, it can only relate to and be construed as applying to the evidence in the cause. The instruction was surely not asked in order that the court might have an opportunity to announce an abstract proposition; and when the court proceeds to state the effect of circumstantial evidence, and tells the jury that "evidence should not be discredited because it is circumstantial," there being evidence of no other character before the jury, we can but regard it as an instruction on the weight of the evidence. And, again, when the court tells the jury that: "Such evidence is often more reliable than the direct testimony of eyewitnesses, when it points irresistibly and conclusively to the commission by the accused of the crime; a verdict of guilty in such cases may rest upon a surer basis than when rendered upon the testimony of eyewitnesses, whose memory must be relied upon, and whose passions and prejudices may have influenced them,"—can we say otherwise than that the court, in so instructing the jury, was instructing them upon the weight and effect of the only character of evidence that was before them? The court surely, when it says that such testimony is more reliable, and that a verdict of guilty may rest upon a surer basis than when rendered upon the testimony of eyewitnesses, was speaking of the weight of the evidence.

It is further contended by counsel for the prisoner that the court erred in giving the sixth instruction on behalf of the State, which reads as follows: "The court instructs the jury that you are the judges of the weight and credibility of the witnesses who have testified in the case, and that you have a right to give such weight and credit to the testimony of a witness as in your judgment, from all the circumstances, it is entitled to. And if you are of the opinion that any witness has wilfully and corruptly testified to what is false, you are at liberty to reject all of his testimony that is not corroborated by other evidence." This question was considered and passed upon by this Court in the case of *State* v. *Thompson*, 21 W. Va. 741. The third instruction in that case given at the instance of the State to the jury reads as follows: "The court instructs

the jury that, if they are satisfied from the evidence of William Patterson, Esther Patterson, Harvey Patterson, Alfred Allen, Moses Hunt and Rebecca Hunt, witnesses for the State, or either or any of them, have or has willfully and knowingly sworn falsely as to any fact or matter material to the issue involved in this case, that the jury are to disregard each and every other material fact sworn to on this trial by each and every of said witnesses whom they are so satisfied have sworn falsely as aforesaid, except so far as they may be further satisfied from the evidence that the other material fact or facts so sworn to by each witness or witnesses has or have been corroborated by other creditable evidence in the case." The Court, speaking through GREEN, JUDGE, in that case, on page 756, says: "In determining whether this instruction should have been granted, it is necessary for us to have a clear conception of the respective duties and obligations of the court and jury in the trial of such a case. In England, as well as some of the states of this Union, much more latitude is given to the judge in such a case than is given them in Virginia or in this State. In some of the states the rule seems to be that a judge has the right to express his opinion to the jury on the weight of evidence, and to comment thereon as much as he deems necessary for the course of justice; and an erroneous opinion on matters of fact is no ground for a new trial, unless he goes to the extreme of inducing the jury to believe that he has withdrawn this matter from their consideration,"—citing *Com.* v. *Child*, 10 Pick. 252; *People* v. *Rathburn*, 21 Wend. 509; *Johnston* v. *Com.*, 85 Pa. St. 54. He further says in the opinion: "A far different rule has always prevailed in Virginia and West Virginia. Our authorities are reviewed in the case of *State* v. *Hurst*, 11 W. Va. 75. It is there said: 'In Virginia the courts have always guarded with jealous care the province of the jury.' Thus, as far back as *Ross* v. *Gill*, 1 Wash. (Va.) 88, President Pendleton said: 'If the question depends upon the weight of testimony, the jury, and not the court, are exclusively and uncontrollably the judge.' He also quotes from *Mc-Dowell's Ex'r* v. *Crawford*, 11 Grat. 405, as a result of the conclusion of a review of the cases by Judge Moncure: 'They evince a jealous care to watch over and protect the

legitimate powers of the jury. They show that the court must be very careful not to overstep the line which separates law from fact. They establish the doctrine that, when the evidence is parol, any opinion as to the ' weight, effect, or sufficiency of the evidence submitted to the jury, any assumption of a fact as found, or even an intimation that written evidence states matters which it does not state, will be an invasion of the province of the jury.' And he adds : 'If the province of a jury should be thus guarded with jealous care in a civil case, much more, and for stronger reasons, should it be watched, guarded, and protected in a criminal case.' " In that case the court made this remark to the jury when it was reported to him that one of them said they could not agree : "I see no reason why the jury cannot agree upon a verdict in this cause," and directed the jury to return. They found the prisoner guilty, and the appellate court deemed this a sufficient reason to set aside the judgment and verdict, and grant a new trial. The case of *State* v. *Batsall*, 11 W. Va. 704, was also cited. In that case it was held that "a conviction may be had on the uncorroborated testimony of an accomplice, and in such case, if the judge who presided at the trial is satisfied with the verdict, and refuses to set it aside, the appellate court will not reverse the judgment and set aside the verdict on the ground that it rested solely on the uncorroborated testimony of an accomplice." This conclusion is based on the fact that the jury are the sole judges of the credibility of all admissible testimony, and in this State the Court would err in advising the jury not to convict on the uncorroborated evidence of an accomplice, though this is the common practice in England and in some of the states. But it is utterly opposed to the practice in this State or in Virginia.

On pages 740, 741, 11 W. Va., this Court says : "Our courts are somewhat peculiar in this respect; but the law has been so held in Virginia from the earliest history of her jurisprudence, and we think it constitutes one of the brightest ornaments thereof." Again, in the case of *State* v. *Greer*, 22 W. Va. 813, the court refused to instruct the jury, at the instance of the prisoner, as follows : "The jury are instructed that the alleged declarations made by the prisoner after he struck the blow on the deceased are

to be taken in connection with the state of excitement and confusion of mind of the prisoner. If the jury believe he was excited, and in a raving state, as given in evidence, and if such declarations were made under such circumstances, they are to be admissions only that he struck the blow, and not a confession of any particular grade of crime; and the jury are further instructed that such declarations are to be considered by them with great caution, in view of the infirmity of memory and influences which often affect witnesses, and, if they believe that any of the witnesses for the State were actuated by partisan sympathy, prejudice against the prisoner, or bias in favor of the prosecution, who testified to such declarations, such declarations ought to have but little weight.' Commenting on the action of the court below in refusing said instruction, this Court said: "Without attempting to say how much of said instruction propounds the law correctly, it was sufficient, to warrant the refusal of the court to give it, that it asks the court to instruct the jury on the weight of the testimony. No instruction is proper that informs the jury as to what weight the evidence should have upon their minds. If the evidence is competent, it is for the jury alone to weigh it,"— citing State v. Thompson, supra. The question presented for the consideration of the Court in Betsall's Case, 11 W. Va. 703, was whether a conviction may be had upon the uncorroborated testimony of an accomplice, and the court held (point 10 of the syllabus) that: "While such testimony is suspicious, and emanates from a bad source, yet the jury may believe it, although it is wholly uncorroborated; and in this State it is not proper for the court to give any instructions to the jury as to the weight of such or any other evidence." In the case of Ware v. State (decided by the supreme court of Georgia, July 8, 1895), reported in 23 S. E. 410, it was held (point 2 of syllabus) that: "Upon the trial of a criminal case, where the principal incriminating evidence against the accused is purely circumstantial, consisting almost entirely of a similarity between certain tracks alleged to have been discovered near the scene of the crime and other tracks at other places, shown to have been made by the accused, all of which indicated a like peculiarity in the shape of the boot or shoe

with which they must have been made, a charge to the jury that, in a case where there is nothing more than mere tracks, they should not be authorized to find the defendant guilty, unless there is some peculiarity about the tracks, is erroneous, under section '3248 of the Code, as expressing and intimating an opinion upon the weight of the evidence." The court, in its opinion, says : "There was a peculiarity about the track made by the defendant. There was a similar peculiarity about the track made at the scene of the homicide. The court charged the jury that a mere similarity of tracks alone would not be sufficient to sustain a conviction of the defendant, unless there was a peculiarity about the track. The effect of this charge was a direct intimation to the jury—but presumably unintended—that, if there was a peculiarity about the track, then mere tracks would be sufficient to justify a conviction. The vice of this instruction consists in telling the jury at all what evidence 'would·be sufficient to convict. Upon this point jurors are not required to consult the court, nor is the court authorized to give them the benefit of its advice. They are the exclusive judges of the evidence. They are the ministers chosen of the law to deal with these questions of fact. The evidence is sufficient whenever there is enough of it to generate in the minds of the jury a belief beyond a reasonable doubt of the guilt of the accused."

The authorities and decisions above cited and quoted, as I understand them, enunciate correctly the law of this State bearing upon the questions raised by the objection of the prisoner to the third and sixth instructions asked for and given to the jury at the instance of the State, and, as I think, they clearly direct the jury what weight should be given to circumstantial evidence, which constituted almost the entire evidence that was before them. In my opinion, the court invaded the province of the jury in a manner not sanctioned by law, and in so doing committed an error prejudicial to the prisoner. Upon the question as to . whether the prisoner was injured by these instructions, this Court has held in the case of *Nicholas* v. *Kershener*, 20 W. Va. 253 (point 10 of syllabus), that, "where an erroneous instruction has been given to the jury, the presumption is that the exceptor was prejudiced thereby, and

the judgment will be reversed for this cause, unless it clearly appears from the record of the cause that the exceptor could not have been prejudiced by the giving of such erroneous instruction"; and the same is held in the case of *State* v. *Douglass*, 28 W. Va. 298 (point 6 of syllabus). Can we say that the prisoner was not prejudiced by the action of the court in telling them that "circumstantial evidence is often more reliable than the direct testimony of eye-witnesses," and that "a verdict of guilty in such cases may rest on a surer basis than when rendered upon the testimony of eyewitnesses, where memory must be relied upon, and where passions and prejudices may have influenced them," and in further telling them that, "if they were of opinion that any witness had willfully and corruptly testified to what was false, they were at liberty to reject all his testimony that was not corroborated by other testimony." The jury surely had the right to believe portions of the testimony of a witness, although they may have believed he swore falsely as to other matters, and that, too, without waiting for corroboration; and it had a tendency to prejudice the prisoner when the court told the jury that they were at liberty to reject the testimony of such witness without also telling them that they were at liberty to credit his testimony.

It is further claimed by counsel for the prisoner that the court erred in admitting improper evidence against the accused, and rejecting proper evidence offered by him; also in improperly admitting expert testimony in favor of the State, and in improperly rejecting expert and other evidence offered in behalf of the defendant, as set forth in bill of exceptions No. 4. During the progress of this trial several medical witnesses were examined, and it is claimed by the plaintiff in error that they went beyond the limit prescribed for witnesses of this character, in this; that they gave their opinions and conclusions in regard to facts which were brought to their attention, conclusions which it required no skill or science to reach, but conclusions which the layman or juryman were just as capable of correctly arriving at from the facts as the medical expert. The object in the examination of experts, and the manner in which their testimony is limited and circumscribed by law, is clearly and concisely stated in the case

of *Hunt* v. *Gaslight Co.*, 8 Allen, 169, where it is held that
"the object of all questions to experts should be to obtain
their opinion as to matters of skill or science which are in
controversy, and at the same time to exclude their opinions
as to the effect of the evidence in establishing controverted
facts." The theory of the State in the case under consid-
eration was that the deceased came to her death as the re-
sult of choking, inflicted upon her by the prisoner, and
that, after death had resulted, she was thrown in the
creek, to create the impression that she had drowned her-
self; while, on the other hand, the contention of the pris-
oner was that for some time she had shown indications of
melancholy and insanity, and that in a fit of despondency
she had thrown herself in the water, and the abrasions on
her face and neck were either caused by the branches of
trees which hung down near the creek, or by her own
hands, in attempting to make a speedy end to herself; and
testimony was adduced for the State and for the prisoner
in support of these opposing theories. To support the con-
tention of the State, medical experts were introduced, and
their opinions were called for, with a view of influencing
the verdict of the jury, and certain questions were pro-
pounded to these medical men, which were objected to by
the prisoner. The objection was overruled by the court,
and the prisoner excepted, and the action of the court is
assigned as error.

Now, in order to pass correctly upon the ruling of the
court upon these questions, it becomes necessary to ex-
amine the law governing the admission of expert tes-
timony, and then determine whether the questions pro-
pounded to these medical witnesses were admissible under
the rules of evidence. Now, in the eighth volume of the
Encyclopedia of Pleading and Practice, under the title of
Expert Witnesses (page 751), it is said: "While the ad-
mission of the opinion of experts necessarily gives rise to
very nice distinctions between facts and findings, it never-
theless does not annul the rule of law axiomatic with
reference to them, as well as to all witnesses, that they
must not be so examined as to substitute their opinions for
the verdict, and thus completely usurp the peculiar
province of the jury,"—citing numerous authorities, and,
among others, *Livingston* v. *Com.*, 14 Grat. 594; *McMechen*

v. *McMechen*, 17 W. Va. 683; *Kerr* v. *Lunsford*, 31 W. Va. 659 (8 S. E. 493); *Bowen* v. *City of Huntington*, 35 W. Va. 682 (14 S. E. 217). And on page 754 it is further said: "Although an expert may have heard all the testimony in the case, he cannot be asked to give his opinion, based merely upon his having heard such testimony, whenever there is a conflict therein, unless the same is hypothetically propounded to him." And on the next page we find it stated that "an expert cannot be asked to give his opinion upon doubtful facts in the case on trial which remain to be found by the jury, but a similar case may be hypothetically put to him, based upon the evidence in such case." Starkie, Ev. (9th Ed.) top page 154, says: "In general, scientific men ought to be examined only as to their opinion on the facts proved, and not as to the merits of the case." And on page 157 the same author says: "But where the inquiry relates to a subject which does not require peculiar habits of study in order to enable a man to understand it, the opinion of skilled or scientific witnesses is not admissible." JUDGE GREEN, in his opinion in the case of *Welch* v. *Insurance Co.*, 23 W. Va. 306, quotes the above from Starkie, and adds, "He is unquestionably right in this position."

Let us look now to the character of some of the testimony of the medical witnesses examined by the State and objected to by the prisoner; referring first to the testimony of Dr. M. H. Brown, who assisted in the autopsy. He was asked, "What was the nature of the wounds on the neck? Describe them;" and replied: "It was what we term an 'abrasion.' The skin was removed, and a little blood had come to the surface,—what you people would call a 'scab.' Some were larger than the others." Again, this witness was asked, "What did these marks on the neck resemble, if anything, when you looked at them?" In his answer he says, "Please explain what you mean by that—'what did they resemble'?" He then was asked, "What did they look like as to how they were made?" This question was objected to, the objection was overruled, and an exception taken. The witness then answered, "When I looked at these marks, the idea seemed to come to me that they were made by hand." So it is perceived that, instead of describing the appearance and size of the

abrasions, so that the jury might know upon what he based his inference, he swears to his conclusions from the appearance of the marks, and it required no skill or science on his part to tell what impression the appearance of these abrasions made upon his mind; and, if he had answered the question properly, and told what the abrasions resembled,—that is, what was their general appearance,—the jury would have been just as capable to form a conclusion as he was, and it presents just such a case as the books tell us an expert is prohibited from giving his conclusion or opinion in, and in which he cannot give his opinion without invading the province of the jury. Again, Dr. Few, a witness for the State, when asked to describe the wounds on the neck as carefully as he could, answered: "They were from mere scratches, or simple abrasions, to complete removal of the cuticle. They were superficial, only on the surface,—and were bright red, from the clotted condition of the blcod on them. There was no discharge." And when asked, "From your examination of these external marks on the neck, what did these marks resemble, if anything?" the question was objected to, overruled, and an exception taken, and the witness answered: "Well, I have nothing in pathology or medicine to give me a standard by which to compare the wounds, but they suggested themsslves to me on first sight as being finger marks. I can't explain it through any logical reasoning at all, but a mere suggestion." Now, this question and answer demonstrate clearly that the opinion called for in the question was not such as an expert or a witness examined as an expert had a legal right to give, as the witness answers frankly that he had nothing in pathology or medicine to give him a standard by which to compare the wounds (that is, neither science nor skill were required to answer the question), yet he proceeds to tell what they suggested to him on first sight, in support of the theory of the State (something which any man who had never opened a medical book could have done as well); and, as I think, the objection was overruled in violation of the rules of evidence with regard to expert testimony, and to the prejudice of the prisoner. The same remarks apply to the testimony of Dr. Fitch, a witness for the State, who was asked to state what these marks re-

sembled, if anything. An objection was made, which was overruled, and an exception taken, and the witness answered, "The impression that I formed was that they were made with the hands and fingers or finger nails." Again, Dr. J. J. Hall was interrogated by counsel for the State as follows: "How did the external marks of violence indicate, if anything, as to how they were made? What did they resemble, if anything?" and over the objection of the prisoner was permitted to answer: "There is no rule laid down by which we can form an opinion as to what produces an abrasion, but I will say they were suggestive of finger marks, because they resembled marks of that character which I have seen, and known to have been produced in that way." It is perceived at once by the answer of this witness that what he has acquired in the way of skill and science in his profession is not brought into requisition to assist him in making this answer. He frankly says, "There is no rule laid down by which we [physicians] can form an opinion as to what produces an abrasion," but he would say they were simply suggestive of finger marks because they resembled marks of that character, which he had seen, and known to have been produced that way. This, then, was not an answer which an expert would be allowed to make. It required the use of no skill or medical science to make it; and yet the objection to the answer was overruled.

The rule in regard to the admission of expert testimony is stated by Rog. Exp. Test. p. 8, § 5, as follows: "The rule is that the opinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it, for the reason that the subject-matter so far partakes of the nature of a science, art, or trade as to require a previous habit of experience or study in it in order to acquire a knowledge of it. When the question involved does not lie within the range of common experience or common knowledge, but requires special experience or special knowledge, then the opinions of witnesses skilled in the particular science, art, or trade to which the question relates are admissible in evidence." The propriety and necessity of confining expert witnesses, in delivering their

testimony, to the strict legal rules governing the admission of such evidence, is apparent when it is considered that the testimony of witnesses of this character, and their opinions derived from peculiar opportunities of study and practical experience, necessarily have peculiar weight with the jury. In the case of *Overby* v. *Railway Co.*, 37 W. Va. 525 (16 S. E. 813), this Court held (point 5 of syllabus) that: "If the facts in a case can be placed before a jury, and they are of such a nature that jurors generally are just as competent to form opinions in reference to them, and draw inferences from them, as witnesses, then the opinion of experts can not be received in evidence as to such facts." Also, in point 6 of syllabus in same case, that "the opinion of a witness who neither knows nor can know more about the subject-matter than the jury, and who must draw his deductions from facts already in the possession of the jury, is not admissible." Rog. Exp. Test. p. 12, § 8, speaking as to the admissibility of expert testimony, says: "Whenever the subject-matter of inquiry is of such a character that it may be presumed to lie within the common experience of all men of common education moving in ordinary walks of life, the rule is that the opinions of experts are inadmissible, as the jury is supposed in all such matters to be entirely competent to draw the necessary inferences from the facts testified to by the witnesses. The testimony of experts is inadmissible upon a matter concerning which, with the same knowledge of the facts, the opinion of any one else would have as much weight." "It is only admissible when the facts to be determined are obscure, and can only be made clear by and through the opinions of persons skilled in relation to the subject-matter of inquiry." In the case of *Bowen* v. *City of Huntington*, 35 W. Va. 682 (14 S. E. 217) (point 4 of syllabus), this Court held that, "where the conclusions called for by a hypothetical question from a medical man, who is being examined as an expert, depends upon facts, the evidential weight of which can only be determined by those familiar with that specialty, then those conclusions may be given by an expert in such specialty." We also also find the law thus stated under the head of "Expert Witnesses" in 8 Enc. Pl. & Prac. p. 755: "An expert can not be asked to give his opinion upon doubtful facts in the

case on trial, which remain to be found by the jury, but a similar case may be hypothetically put to him, based upon the evidence in such case." And the same book, on page 744, says: "The principal object in view in the examination of expert witnesses being to elicit from them opinions or conclusions drawn from the facts, rather than the facts themselves." This species of testimony forms in this respect a notable exception to well-established rules of evidence. The rules governing the introduction of this species of testimony should not, therefore, be relaxed, but should be strictly enforced with the greatest caution and discrimination. Dr. Hartigan, a witness who did not assist in the autopsy, was asked the following question: "From the report of this autopsy, does it not appear that there was simple engorgement of the vessels in that thyroid, and nothing in that autopsy to show that there was any extravasation or rupture of the blood vessels," and answered: "Yes, sir. The examination of the deeper structures of the neck shows an engorged condition of the thyroid region." This question and answer we do not regard as proper under the rules governing the admission of expert testimony. In the case of *Indemnity Co.* v. *Dorgan*, 7 C. C. A. 581 (58 Fed. 945), the law is thus stated, —as we think, correctly: "A physician cannot be asked whether or not, in his judgment, from testimony that he has heard, an autopsy was such as to enable a physician to state the cause of death with any degree of certainty, but the question should recite the scope and character of the autopsy." Taft, J., in delivering the opinion of the court, says: "This question was clearly incompetent, because it asked the witness, who was a physician, to make his own inference as to what the evidence of the other witnesses tended to show, and then, upon such inference, to give his opinion. To properly elicit his opinion as to the character of the autopsy, and its usefulness in showing the cause of the death, counsel should have stated the scope and character of the autopsy as he understood it, so that the jury, in weighing the answer of the witness, could know exactly upon what facts it was based."

It was not alone, however, in the admission of expert testimony in this case that the prisoner was prejudiced by the ruling of the court, and had a right to complain. When

we refer to the testimony of Stephen G. Hess, who was examined as a nonexpert witness, we find that, after stating that he had seen the marks on the neck of the deceased, he was asked, "What did these marks resemble?" and was allowed to state, notwithstanding the objection of the prisoner, that "they looked to me as though some one had just grabbed hold that had a considerable grip." He was also asked to state whether or not he saw any other marks on her body, and answered, "Yes, sir; some other marks or bruises on the arm." He was then asked to describe those on the arm, and replied, "They were on the left arm, as well as I recollect." He was again asked, "Describe them, if you please," and answered, "A kind of a bruise on the arm, as though some one had held it with a severe grip," which answer was excepted to. Now, this witness, instead of describing the wounds and bruises he saw upon the body of the deceased, proceeds to give his conclusions, and produces the same impression upon the jury as if he had stated that, in his opinion, David Musgrave gripped the arm of his wife with one hand, while he choked her with the other. His answer was not responsive to the question; but, when asked "What did these marks resemble?" proceeded to give his opinion and conclusion as to the manner in which the wounds and bruises were inflicted, which was not allowable according to the rules governing such evidence. It is true that in the case of *State* v. *Welch*, reported in 36 W. Va. 690 (15 S. E. 419), the witness Gibson described a depression in the bed and a clot of gore in it, and was allowed to express the opinion that there had been a pool of blood there, and this Court held that it was not error; but the witness in that case drew no inference and expressed no opinion as to how or in what manner the blood stain was caused. He was not allowed to say, as in this case, that it looked as though some one had beaten the head of the deceased with a brick,—the theory in that case of the State being that the deceased was killed by beating her on the head with a large piece of fire brick, while she was lying in bed. The general rule is stated in 7 Am. & Eng. Enc. Law, p. 492, as follows: "The general rule is that witnesses must testify to facts, and not to opinions. They must only state facts, not draw conclusions or inferences. To do so is to usurp

the province of the court or jury." To this general rule,
as a matter of course, there are exceptions, but the answers
elicited from the witness Hess in this case, and which were
allowed to go to the jury, are not embraced within any of
the exceptions. Another witness,—Columbus Michael, a
nonexpert,—after stating that he saw some scars on the
neck, some ten or a dozen, was asked to describe them, and
answered, "I did not examine them pretty close." He
was then asked, "What did they resemble, if any-
thing?" and answered, "They just resembled as if some
man had taken another one by the throat," which ques-
tion and answer were objected to, and the objection over-
ruled. In the case of *Taylor* v. *Railroad Co.*, 33 W. Va.
39 (10 S. E. 29), this Court held that opinions merely of a
witness are not generally admissable evidence; and it also
held that, where illegal evidence is admitted against the
objection of a party, it will be presumed that it prejudiced
such party, and, if it may have prejudiced him, though it be
doubtful whether it did or not, it will be cause for the re-
versal of the judgment; but, if it clearly appear that it
could not have changed the result if it had been excluded,
it will not be the cause of reversing the judgment. And
the same is held in the case of *Hall* v. *Lyons*, 29 W. Va.
410, (1 S. E. 582). Bishop, in his valuable work on Crimi-
nal Procedure (volume 1, § 1177), under the head of
"Opinion of Witnesses," says: "We have seen that what
a witness describes as personally observed is, in philosoph-
ical truth, merely his inference from sensations felt; and
there is no evidence which is not, to this extent, presump-
tive. In other words, all testimony is to opinions. But
the witness alone is competent to form an opinion as to the
cause of his sensations of this class. As to them, he is an
expert, and the only expert in existence. So, when
he speaks of his opinions in this class of facts, he and
his hearers alike term his opinions "facts." But an
opinion which the jurors are in a situation to draw
as well as he, will be drawn by them, and, though
he should also have formed his opinion, he will
not be permitted to state what it is." Again, in 7 Am. &
Eng. Enc. Law, p. 493, it is said: "Opinions are never re-
ceived if all the facts can be ascertained and made intelli-
gible to the jury, or if it is such as men in general are capable

of comprehending and understanding." Also, in *The Nereide*, 9 Cranch, 388, it is held that "a witness ought never to swear to inferences, without stating the train of reasoning by which his mind has been conducted to them." In the case at bar there could have been no difficulty in the way of either of these nonexpert witnesses describing to the jury the size, number, and appearance of the scratches on the neck of the deceased, and giving their locality; but, without attempting to do this, the court permitted them to volunteer their opinions as to the manner in which the scars were inflicted, and stated that "they resembled as if some man had taken another one by the throat." This was the way in which Columbus Michael expressed his opinion, while Stephen G. Hess, another nonexpert witness, expressed the opinion that "they looked to him as though some one had just grabbed hold that had a considerable grip." These opinions, thus expressed, are contrary to the rules of evidence governing the admission of testimony of that character, and, as we have seen, they must be presumed to have been prejudicial to the prisoner. The prisoner was on trial, charged with one of the gravest offenses known to the law. The theory of the State was that he had taken the life of his wife by choking her to death, and then throwing her body into the creek, to create the impression that she came to her death by drowning; and to allow a nonexpert witness to stand before the jury, and state, because he had seen some scars on her neck, his opinion that they were caused by some one grabbing that had a considerable grip, or that they looked as if some man had taken another by the throat, would, in my opinion, be subversive of long and well established rules of evidence in cases of this character.

It is claimed that the court erred in not taking the jury to view the locality where the deceased was found. This matter, as I understand it, is addressed to the discretion of the court (see *Gunn* v. *Railroad Co.*, 36 W. Va. 165), (14 S. E. 465), and this Court would not review that discretion unless it was made to appear that the prisoner was prejudiced by such refusal; but, for the reasons above stated, this cause must be reversed, the verdict and judgment set aside, and a new trial awarded.

Brannon, Judge: (*dissenting*).

David Musgrave was convicted in the Circuit Court of , Monongalia County, in June, 1895, of the murder in the first degree of Emeline Musgrave, his wife, and sentenced to confinement in the penitentiary for life, and has brought the case to this Court by writ of error. Some points made in the assignments of error were not relied upon in this Court. Counsel for the plaintiff in error say that the court erred in giving for the State certain instructions.

Instruction 3: "The court instructs the jury that circumstantial evidence is legal evidence, and in most criminal cases it becomes necessary to resort to circumstantial evidence. Criminal acts are usually performed in secrecy. Evidence should not be discredited because it is circumstantial. It is often more reliable than the direct testimany of eyewitnesses when it points irresistibly and conclusively to the commission by the accused of the crime. A verdict of guilty in such cases may rest upon a surer basis than when rendered upon the testimony of eyewitnesses whose memory must be relied upon, and whose passions and prejudices may have influenced them." (Foregoing instruction, *verbatim*, given by court in *State* v. *Hayward*, 65 N. W. 63).

Instruction No. 6: "The court instructs the jury that you are the judges of the weight and credibility of the witnesses who have testified in this case, and that you have a right to give such weight and credit to the testimony of a witness as, in your judgment, from all the circumstances, it is entitled to. And if you are of the opinion that any witness has willfully and corruptly testified to what is false, you are at liberty to reject all his testimony that is not corroborated by other evidence."

It is said that these instructions both intimate to the jury the opinion of the court upon the weight of the evidence, and thus invade the province of the jury as the sole judges of the weight and effect of the evidence, and violate the rules laid down in *State* v. *Hurst*, 11 W. Va. 54, and *State* v. *Betsall*, *Id.* 703, and other cases of like import. While not intending to intimate a disposition to cross the barrier defending the province of the jury from intrusion by the court, yet when we look at the practice in almost all the states of this Union and in England en-

joining charges by the judge to the end that juries may be
kept from error by a review of the evidence by the court,
I venture to say that the courts of Virginia and this State
have gone very far with this doctrine, if not too far, and
we ought not, by hypercritical construction of instructions, to
carry it so far as to overthrow verdicts fairly rendered upon
fair trial. We must attribute to juries some intelligence.
We must not strain every word dropping from a judge in-
advertently when ruling upon the admissibility of evidence
or other passages in the trial, or strain instructions, as
subverting the freedom or misleading the common sense of
juries. Rather should we say they likely did not do so,
unless plainly calculated to do so. Instruction 3 simply
states the principles by which circumstantial evidence is
to be treated by courts and juries, found in all books and
decisions upon the subject. Those principles are designed
to guide courts and juries in applying circumstantial evi-
dence in trials. Is it possible that an instruction like No.
3, laying down the doctrine of the law of evidence, can be
said to impinge upon the domain of the jury? For what
purpose do our books on the science of evidence treat of
the philosophy of evidence, if not to furnish human tribu-
nals lights by which to apply that evidence, to keep them
from error? These rules are intended as much for the
jury as for the court. Yet you go through a long trial de-
pending on circumstantial evidence, and, according to
this theory, they are to be hidden from the jury, unless
a lawyer reads them, and the court must not mention them
to the jury; and when the jury, for want of their aid,
finds a verdict not conforming to them, these rules are
then presented as cause for setting it aside. A verdict
was set aside in *Flannagan's Case*, 26 W. Va. 116, because
the jury did not conform to these principles. Would it
have been error for the court to have laid down by instruc-
tions those rules as this Court laid them down, and thus
informed the jury of them? Surely not. The State could
not have complained; neither could the defendant. *Perry's
Case*, 41 W. Va. 641, (24 S. E. 634), contains principles
warranting these instructions. That holds it error for a
court to refuse to tell a jury that it is their duty to scruti-
nize with care and caution the uncorroborated and contra-
dicted testimony of a witness. That goes further to invade

the jury's province than these instructions. It may just as well be said that it tells a jury to disregard an uncorroborated and contradicted witness as that these instructions pass on the weight of circumstantial evidence. JUDGE ENGLISH's opinion does not advert to that recent Cass of Perry. It is far more inconsistent with *Betsall's Case* and *Thompson's Case*, 21 W. Va. 758, than this instruction. Counsel for the prisoner invariably call the jury's attention impressively and urgently to the cautionary rules pertinent to circumstantial evidence, and in this case asked an instruction (No. 5) given below; and it would be one-sided to say that the prosecution could not ask such an instruction as No. 3 to avoid any misapplication of such rules. This instruction is simply general in statement, as a general rule, and does not refer to any particular evidence. This instruction in itself, by the words "irresistibly and conclusively," certainly does not tolerate any weakness or uncertainty of evidence. In other respects it guards the defendant. But if, possibly, there could be any criticism of it as endangering the prisoner, other instructions, particularly Nos. 4 and 5 given for defendant, would be its antidote, as they state with emphasis the caution to be observed in using circumstantial evidence.

Instruction No. 4: "Before the jury can find a verdict of guilty of murder in this case, it must not only be proven beyond a reasonable doubt that Emeline Musgrave was actually murdered as a first indisputable fact, but it must also be proven beyond any reasonable doubt that it was the prisoner, David Musgrave, and could by no reasonable hypothesis have been any other person, who committed the crime."

Instruction No. 5: "As guides to the safe administration of justice in criminel cases, where the guilt of the accused is to be ascertained and determined upon circumstantial evidence, as in this case, the court instructs the jury that: First. It is essential that all the circumstances from which the conclusion is to be drawn shall be established by full proof, and the State is bound to prove every single circumstance which is essential to the conclusion in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circum-

stance.  Second.  All the facts and circumstances, when established by full proof, must be consistent with the hypothesis of the guilt of the accused.  Third.  It is essential that the circumstances should be of a conclusive nature and tendency.  Evidence is always indefinite and inconclusive when it raises no more than a limited probability in favor of the fact, as compared with some definite probability against it, whether the precise proposition can or cannot be ascertained.  It is, on the other hand, of a conclusive nature and tendency when the probability in favor of the hypothesis exceeds all limits of an arithmetical or moral nature.  Such evidence is always insufficient where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth.  Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be.  Fourth.  It is essential that the circumstances should, to a moral certainty, actually exclude every hypothesis but the one proposed to be proved by the State.  From these another rule results in criminal cases.  It is this: That the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, amounts to nothing unless the *corpus delicti*—the fact that the crime has been actually perpetrated—be established by full proof, for, so long as the least reasonable doubt exists as to the act, there can be no certainty as to the agent."

It is said that the State's instruction No. 6 is particularly objectionable, because it, in substance, tells the jury that the evidence of a witness who has sworn falsely is of no weight.  It does not say so.  It does not say that the jury must or ought to reject such evidence; by no means.  It tells the jury it has the discretion and power to discredit such evidence, if its judgment calls for it.  What else does it, fairly construed, mean?  Would it mislead any sensible jury?  The jury has that power.  There is a rule in the philosophy of evidence that a witness swearing falsely in one thing affords some ground to discredit him in all

("*Falsus in uno, falsus in omnibus*"). That is a matter left to the jury under all the circumstances, and this instruction goes no further than this. Far different was instruction No. 3 condemned in *Thompson's Case* as it commanded the jury to disregard all evidence of a witness swearing falsely as to anything.

Instruction 9: "The jury are instructed that circumstantial evidence must always be scanned with great caution, and can never justify a verdict of guilty, especially of murder in the first degree, unless the circumstances proved are of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt (but the jury must further remember that crimes are sometimes committed with such secrecy that to require the production of a witness who saw the act committed would be to defeat public justice, to deny all protection to society, to let the greatest offenders go free, and the most heinous crimes go unpunished) ; and the jury are further instructed that in cases of circumstatial evidence, where all circumstances of time, place, motive, means, opportunity, and conduct are proved beyond a reasonable doubt, and concur in pointing out the accused as the purpetrator of the crime beyond a reasonable doubt, it must produce a moral, if not an absolute, certainty of his guilt." *State* v. *Baker*, 33 W. Va. 371, 372, (10 S. E. 639). This instruction is conceded to be correct in the abstract. The principle is one stated by the writer upon the science and philosophy of evidence most eminent to this day of all writers upon the law of evidence, Starkie; and upon the approval of the Virginia court of appeals in *Dean's Case*, 32 Grat. 912, it was stated in *Baker's Case*, 33 W. Va. 319, 371, (10 S. E. 639). If the law of evidence is stated by the court of authority, and is pertinent to the case on trial, it can not be error to use it. It is said a clause in it intimated the opinion of the court that a deep-dyed villain was on trial, and thus prejudiced the jury against him. It plainly purports to state a general proposition, abstract, and not hinting at the prisoner. It is full of caution, emphatic in the expression of caution.

Certain evidence was admitted, which is said to have been improper, On the night of December 13, 1894, Eme-

line Musgrave was found lying dead, face downward, in Big Indian Creek, in very shallow water. An inquest was held, and she was buried, and a few days later the body was exhumed, and a post mortem examination held. The theory of the State was that her husband choked her to death, and put her body in the creek, to create the impression that she drowned herself; or choked her into a state of insensibility, and, believing her dead, took her body to the creek, and threw it in the water, where she may have died without recovering consciousness, or, having partially revived from contact with the cold water, may have died from drowning. There were a number of marks and abrasions upon both sides of her neck, and the State sought to show that these marks were marks made by fingers and finger nails in choking. Various witnesses, expert and nonexpert, were asked what, in their opinion, produced these marks, and they answered that they had the appearance of having been made with the fingers. It is strenuously urged that opinion evidence is not generally admissable. It is clear that the State had a right to show that such marks were made with the fingers. But how? The defense says it must adduce evidence descriptive of the marks, and let the jury judge how they were made. But it would be difficult to exactly describe their form, outline, and exact appearance, so as to portray them to the jury as they appeared to the eye; so as to let the jury see them, as it were. Their appearance was material. She could not be brought back from the grave. Decomposition had destroyed the marks. How can this appearance be preserved to the jury as naturally—as truly—as is possible? Only by evidence of the marks as they appeared to those who saw them, and their opinion on view of them. They could not otherwise be reproduced. Necessity called for this opinion evidence. In *State* v. *Welch*, 36 W. Va. 690, (15 S. E. 419), we held that a witness might give his opinion that a depression in a bed was, from its shape and appearance, caused by the head of a person, the witness having seen it; giving as one reason that the bed could not now be produced to the jury. So here the dead body can not be laid before the jury that they may look upon the wounds, in order that those wounds may, from their appearance, tell the jury what caused them; and we can

only do the next best thing,—that is, have witnesses who saw them to say what, in their opinion, caused them. Since the *Welch Case* I met with the case of *Com.* v. *Sturtevant*, 117 Mass. 122, (19 Am. Rep. 401), in which the question is fully considered, as also in the note to that case, and it is held that "common observers, having special opportunity for observation, may testify to their opinions as conclusions of fact, though they are not experts, if the subject matter to which the testimony relates can not be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express his opinion are such as men in general are capable of comprehending and understanding." This is a very accurate statement, and supports the *Welch Case.* A witness was there allowed to say in what direction, in his opinion, the blood forming a blood mark had come. It was permitted to say whether, in his opinion, shoes taken from the defendent's house, claimed to fit his track, had been recently washed. I find it stated in Rog. Exp. Test. §§ 3, 4, that a witness may state his opinion "when the primary facts on which it is founded are of such a nature that they cannot be adequately reproduced or described to the jury, so as to enable another than the actual observer to form an intelligent conclusion from them." Necessity calls for this. 1 Whart. Ev. § 511, lays down the rule that opinion evidence is admissible as follows. "A *fortiori*, whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury, or when language is not adequate to such realization, a witness may describe it by its effect on his mind, even though such effect be opinion." Now, you cannot precisely describe in words the shape, color, and general appearance of finger marks on the neck of a dead person. The description would not be plain and palpable to the jury. Much less can you describe wounds made by by finger nails. What a more common matter of everyday observation than the human foot? You allow witnesses to give their opinions that impressions in snow or mud are those of the foot, and of a particular person. *State* v. *Milmeier* (Iowa; 1897) 72 N. W. 275,—allowing witness to say tracks looked like prisoner's foot. How certain is the hunter that a track is that of a

bear? He is permitted to express his opinion of it. What a more common matter of every-day observation than the human hand? If its imprint were in snow or mud now lost, would you not allow an opinion of one who saw it that it was made by the hand? Why reject the opinion of a witness that the impression of a bloody hand on wall or floor belonged to a hand? You would admit all this evidence. Why reject it when the impression is on the neck? We admitted evidence that spots looked like blood marks in *Baker's* and *Welch's Cases*. The Massachusetts court, in *Cone* v. *Dorsey*, 103 Mass. 413, allowed a witness to say that hair on a club appeared to the naked eye, human, and to resemble that of deceased. (I notice that the work issued since this opinion was delivered, Gillett on Indirect & Collat. Evidence § 213, sustains the views here expressed as to such opinion evidence).

But it is urged that, if this opinion evidence is admissible, it is only so when the witness has stated the character and description of the wounds, and then may express his opinion as to how they were made. The general rule is that the witness is to relate the facts as fully as he can, and add his conclusion from all he saw. *Taylor* v. *Railroad Co.*, 33 W. Va. 39, 54, (10 S. E. 29). It is said in brief that out of eighteen witnesses, eleven were allowed to give their opinions without any description whatever of the marks on the neck and throat of deceased, as to number, position, size, or any other description. An examination of the evidence of these witnesses has shown me that they give description by number, location, color, size, length, whether abraded or not, direction of mark, general appearance, with reasonable fullness, — as much fullness as non-expert witnesses would be expected to do, quite fully, indeed. The witnesses would describe them before the jury by illustration with their hands on their necks or throats. This being so, there was a sufficient foundation laid for the opinion evidence. Its weight was for the jury. "If any material facts at all are stated by the witness warranting the inference that he has sufficient knowledge to form an opinion, it is the duty of the court to permit it to go to the jury for whatever it may be worth," said the court in *Goodwin* v. *State*, 96 Ind. 558; and Rog. Exp. Test. p. 9, says that:

"While the general rule is that the witness must state the basis, in some cases it is impossible, in the nature of things, to describe the facts, and the opinion of the witness will not be excluded in such a case because of his inability to give a description of the facts." In *Jones* v. *Fuller*, 19 S. C. 66, it is held that, while it is necessary that the witness should first state the facts on which he bases his opinion, where the facts are such as are capable of being reproduced in language, it is not necessary to do so where the facts are not capable of reproduction in such way as to bring before the minds of the jury the condition of things upon which the witness bases his opinion. The same principle in *Sydleman* v. *Beckwith*, 43 Conn. 9. The evidence tended to show nineteen wounds or marks on the throat and neck of the deceased, to say nothing of wounds and bruises on the arms, one below the eye, one above, one on the hand. How difficult to describe those throat marks so accurately—their exact look—as to give the jury the same impression of them as they made on the witnesses who saw them.

Prisoner's counsel insist that the court erred in not granting a motion to take the jury to the creek where the body was found, for a view. Counsel thus, in substance, state the reason for the view: The theory of the State was that the deceased was choked, and from the choking died, or was rendered insensible, and was carried and put in the creek where she was found, either after she was dead, or after she was insensible; and, if not dead when put in, that she drowned. The State insisted that there was no froth coming from the mouth, and the water was still, and this indicated that she was not drowned; and the marks on throat and neck indicated that she had been choked to death before being put in the water. The theory of the defense was that she had a suicidal mania; had before tried to hang herself; and had left her husband's side after they had retired, and he, supposing she had gone out at a call of nature, was not alarmed, but, not returning, became uneasy, and on search she was found in the water; that she had thrown herself into the creek; and there was a tree on its bank, with jagged branches near the ground, which, as she went in, she struck, and thus produced the marks on the neck and throat; or that in the

convulsion of drowning she clutched her neck and throat with her hands, and thus produced the marks; and the water where she was was running water, which would account for the fact that no froth came from her mouth. The State introduced witnesses testifying there was no tree as claimed by the prisoner, and the location of the place not as claimed by him. The defendant introduced evidence of the tree's being there, and of its jagged branches, and of the running water. He introduced photographs of the place, but claimed they were imperfect representations of the place. Views are very inconvenient and productive of delay. Only where the nature of the case peculiarly requires it,—where by evidence the place and surroundings cannot be shown, and they are indispensable to a correct understanding and just decision,—should they be enforced; certainly not otherwise on appeal to this Court. In *Gunn* v. *Railroad Co.*, 36 W. Va. 165, (14 S. E. 465), it is held that a demand for a view is peculiarly within the discretion of the trial court, and, before its ruling thereon will be disturbed, it must be made clearly manifest that it was necessary to a just decision, was practicable, and its refusal probably to the injury of the party. We can not see such necessity in this case. Mere conflict of evidence as to things of a nature readily provable furnished no ground. Places and grounds are the scenes of transactions involved in every suit, and application of this statute here would equally call for a view in almost every case.

The admission of certain expert evidence is complained of as error. Dr. Brown was asked, "From your examination of the deceased, what, in your opinion, caused her death?" and answered, "I think she was asphyxiated." He was requested to "state whether or not that death resulted from natural or violent causes," and answered, "Violence." It is argued that he was asked these questions without having had any hypothetical question propounded to him to enable the jury to know on what he based his opinion. Is it meant that the questions should have been put in hypothetical form? If so, the proposition is untenable, as this physician personally examined the corpse at the creek when found, and at the subsequent formal autopsy, and from facts testified by himself was, as an expert, authorized to give a proper opinion. A hypo-

thetical question to an expert is only necessary where he does not base his opinion on facts testified to by himself, but on facts testified to by others. *McMechen* v. *McMechen*, 17 W. Va. 683, 694; Rog. Exp. Test. 75. JUDGE ENGLISH seems to overlook this distinction. The questions themselves are, in their nature, proper, as it is well settled that a physician or surgeon may give his opinion on facts testified to by himself or others as to wounds proven to have been inflicted on a deceased person, whether such wounds would be cause adequate to produce death, or were the actual cause of death. *Livingston's Case*, 14 Grat. 592; Rog. Exp. Test. § 49, p. 119; 1 Greenl. Ev. § 440. "It is settled that medical experts may state opinions as to the means by which a wound was inflicted." Rog. Exp. Test. § 53, p. 127.

The following question is said to be improper, put to said physician: "What conditions or indications did you find on your examination at the creek, on the night you first saw her, or upon your examination at the autopsy, inconsistent with the theory that the deceased came to her death by drowning, if anything?" Now, the State had the right to prove that the deceased died from violence, not by drowning. If she was choked to death, her body would present appearances indicative of that cause of death; if she drowned herself, it would present appearances indicative of that cause of death. The State had the right to show the presence of conditions or indications upon the body pointing to death by violence, and inconsistent with the theory of drowning; to prove signs on the body not found in cases of death by drowning. Counsel say the State could put an hypothesis, and then ask the opinion of the physician whether the deceased came to death by drowning. If entitled to give evidence to prove that she did not come to death by drowning, as it did, why could it not fortify this theory by showing reasons for the conclusion by showing the presence of appearances negativing the theory of drowning? The question simply called for those appearances. You would not deny the State's right to show signs of death by violence. Why shall it not repel the theory of drowning by showing signs denying it? The defense would be allowed to show signs of death by drowning, and

why not the State be allowed to show those tending to repel it?

The following question is objected to: "I will have you to state whether or not the condition of the thyroid region, externally and internally also, would be inconsistent with the theory of drowning?" What has been just said as to the next preceding question will also apply here. The witness had made examination of the thyroid region, had stated it in evidence, and surely he could have been asked if it indicated violence; and why not be asked if it indicated a condition telling of something else than drowning? "It is a rule of evidence that either party may ask an expert as to the reasons on which his opinion is based." Rog. Exp. Test. § 37. These questions only amount to this.

Objection is also made to the following question: "If all the external marks of violence found by your examination, and set forth in your autopsy as heretofore described, producing internal conditions resulting therefrom, had been received by a person at or near the same time, or in quick succession, what effect would they have upon the person as to syncope, and vitality or consciousness, in your opinion, except the one you.have described at the insertion of the deltoid muscle?" Dr. Brown had said he found on the left frontal region a wound an inch long, two or three scratches on the right side of the nose, and a dozen on either side of the neck, one on the left arm, near the insertion of the deltoid muscle, one on the middle and lower third of the radius about an inch in diameter, one on the ulnar side two inches in diameter, both of which were bluish black discolorations, one on the right arm half an inch in diameter, one on the wrist,—showing the jury the place of the wounds. He had minutely described an engorged state of the blood vessels of the neck, the jugular vein on both sides of the neck, and other smaller blood vessels, the abrasions of the skin and their bleeding, of the right side of the heart being distended with blood, the left ventricle with little blood in it, of the distention of the air cells of the lungs, and of the rupture of some of them, and of one or two coming together, of the emphysematous condition of the lungs, of the appearance of the throat inside, and of other details of the appearance of the body. This

question, based on what he said of marks of violence apparent in his first examination of the body and the subsequent autopsy, revealing external and internal condition, was designed to elicit his opinion as an expert as to the probable effect of the violence in the way of producing fainting, loss of vitality and consciousness, to support that phase of the state's theory of murder that deceased had been by violence rendered unconsicous, and nearly dead, and then put in the water and her death accomplished. The question sought to show that such wounds and violence and their resultant condition of the body would indicate the probability of such syncope or fainting. Why it was not legitimate, I am unable to see.

Counsel say the following question was bad: "Suppose the deceased had received the wounds or contusions, and had the internal condition as described by you produced thereby, what effect would that have upon the consciousness of the deceased, in your opinion?" He answered, "Judging from the revelations of the autopsy, I should think the deceased was unconscious." What I have said as to the next preceding question equally applies to this question. The following question was put to Dr. Brown by prisoner's counsel, and the court refused to allow it to be answered: "Do not your medical books, authorities, and instructions at the schools in your profession teach you that in the act of drowning there is great constriction of the muscles of the throat in the thyroid region, and a convulsive effort to prevent the ingress of water, and a strong, spasmodic effort to breathe, resulting in a contraction of the muscles?" This question called for what books say, what medical professors say in lectures, and also the interpretation by the witness of what the books and professors say. The professor's statement to his class is unsworn. The author's statement in his book likewise. Books and professors differ, and change with the advance of science and discovery. A few states perhaps,—as Alabama and Iowa,—have admitted the books themselves. In Iowa such a question as this was asked, but refused, because it invoked the opinion of the expert as to the teaching of the books, but the books were held admissable. But in England and the great bulk of our states it is not allowed to introduce books on science, much less the ex-

pert's construction. Rog. Exp. Test. §§ 164-166; *Stilling* v. *Town of Thorp*, (Wis.) 11 N. W. 906; Whart. Ev. § 665. Statements of a medical book cannot go in evidence as authority on medical questions, though testimony as to what it says, if admitted, may be contradicted by producing the book. *People* v. *Millard*, 53 Mich. 63, (18 N. W. 562); Whart. Ev. § 665. It seems such books cannot be read in argument to the jury. *Insurance Co.* v. *Cheever*, 38 Am. Rep. 573 and note, 578.

The following question was propounded to Dr. Brown, but the court refused to allow it to be asked, and its refusal is pointed out as error: "Do you consider yourself an expert on death by drowning, and the appearance and conditions resulting therefrom as shown by *post mortem* examination?" No authority is given in the briefs to help us here. The question called for mere opinion, and that, too, the doctor's own opinion of his own capacity,—a very unreliable guide. Could you expect a reliable opinion on so delicate a question? He could be asked as to his professional education, practice, *etc.*, as he was, to enable the jury to judge of the worth of his evidence; but it does not seem that his own mere naked opinion of his own capacity would be admissible on even cross-examination to test his capacity. In *Boardman* v. *Woodman*, 47 N. H. 119, a witness was asked, as I understand, after he had been allowed to give evidence as an expert, whether he considered himself competent to give an opinion as an expert on the subject of insanity, and it was refused, and the court held that the question of competency was for the court alone, "and it is entirely immaterial what the witness' own opinion may be as to his own qualification or competency." So in *Naughton* v. *Stagg*, 4 Mo. App. 271. If error herein, it is by no means so material as to affect the case.

The following question, put by the State to Dr. Few, was objected to: "State whether or not, from your examination of the body, considering the character, condition, size and location of the external marks of violence, the contusions and abrasions found by you in your examination, it is your opinion that any, and, if any, what ones, of them were inflicted by the deceased, taking into consideration the external and internal condition." There are

many causes of death. Each cause has its indications pointing to it as cause. You can show the presence or absence of those indications by expert evidence. This question called for any indications of death by self-strangulation. If self-strangulation is attended with certain signs, this question called for them. If present, they would tell of self-strangulation; if not present, they would repel it. Why has not either side the right to show this? Now, if self-strangulation has, in science, any such signs, it was a proper subject of expert evidence. Whether it has or not is a proper subject of inquiry by expert evidence. If it has no indications under science, so as to call for expert evidence, then it is a matter of common experience and nature, provable by non-expert evidence; and this witness, having seen the body, could give his opinion. I think it a proper subject of expert inquiry. In Rog. Exp. Test. 127, it is stated broadly that experts may state their opinions as to means by which wounds were produced, —whether accidentally or not, or with this instrument, *etc.* This would justify this question.

The court refused to allow the following question to be answered, and it is relied on as error: "If the body had been removed from the water with the head depending down, and if removed from a running stream, would the absence of froth be conclusive evidence that the party did not die by drowning?" This is an indefinite, if not an irrelevant, question. What does it seek to prove? That the water, if any, in the body, would run out? If so, it should have been directed to that. But, say it meant to disprove the State's theory that, as there was no froth coming from the mouth, the deceased did not drown herself. The defense had Dr. Few's emphatic opinion in its favor on that. Just before this question was asked, the defense had asked him, "Is the absence of froth from the mouth proof that the person did not die from drowning?" He answered, "It is not." And the next question after the rejected one was, "Is the absence of froth from the mouth or nostrils conclusive evidence that the party did not die from drowning, and do not medical authorities with which you are familiar teach that the absence of froth is not conclusive that the party did not die from drowning?" and the answer, "The absence of froth at the mouth

is not evidence that they did not drown." No reason is given by the State's brief for the refusal of this question. Suppose we say it was proper, yet the [other questions afforded the prisoner full means to elicit from the witness his opinion on the question whether absence of froth was conclusive evidence of drowning, and he did elicit it, and that, too, in his favor. Clearly, it would be out of all reason to say that the refusal of this question, if wrong, is so hurtful as to upturn a long trial. We see it did not—could not—hurt the prisoner.

The court struck out certain expert evidence of Dr. Mackey, a witness introduced by the prisoner. Why, the brief for the State does not say or intimate to our help. I gather that it was because his opinions appear to be based on what "was taught and maintained by many reputable members of your profession"; and this was not admissible. But, after striking out this evidence, an elaborate examination of Dr. Mackey was accorded the prisoner upon the very matters on which the rejected evidence bore, in which he gave opinions the same as in the rejected evidence, but not based on what other professional men say, but on his own knowledge as an expert. Dr. Mackey, in the rejected evidence, stated that no ecchymoses were found beneath the pleura, pericranium, and pericardium, and that their absence told of death by drowning, as they are never found there in cases of drowning. In his continued examination which remained in the case, he stated that ecchymoses were not found beneath the pleura, pericardium, and pericranium, and that, in his opinion, that was evidence that Mrs. Musgrave came to her death by drowning, and that, in his opinion, she did so come to death. So there is plainly no error in rejecting said evidence. It is mentioned, but does not seem to be urged, in brief of counsel. See *Olfermann* v. *Railroad Co.*, (Mo. Sup.) 28 S. W. 742.

The State put to Dr. Hartigan, a witness for the defense, as an expert, this question, against the defendant's objection: "State whether or not, in a case where you found the condition set forth in the autopsy, and, in addition, extravasated blood of the thyroid region, you found external marks of violence on the neck,—state if these distinct and well-marked evidences of violence and force and pressure should be considered in making up a judgment or

opinion as to the cause which produced that condition of the thyroid region." The answer was, "They should." Now, this question was based on the autopsy in evidence, and on marks of violence which there was evidence tending to show,—in fact, not denied; and why such marks should not enter into the medical expert's opinion as to the cause of death I am not able to discover. *Livingston's Case*, 14 Grat. 592, says the physician may say whether, in his opinion, certain wounds would cause death. Why not, then, take them into consideration? Certain physical appearances may be taken as cause of death by experts, and they may so state. Rog. Exp. Test. 127. What if this evidence tended to corroborate the opinions of the State's experts, in whose opinions those marks were taken into consideration?

Edith Michael, a State witness, was asked on cross-examination by the prisoner whether it was not a fact that her father and the prisoner had been on unfriendly terms, and whether, as a member of his family, and as frequently visiting her father, she participated in the unfriendly feeling; and the court refused to allow her to answer. No reason is suggested to us why it might not have been allowed, and thus all question saved, and I see none, unless the source of unfriendliness was too remote. But it is too unimportant to reverse.

Asheville Snyder gave evidence to show angry conversations between the prisoner and wife on several occasions, and there was much other evidence that they frequently quarreled, and he kicked and choked her on some occasions, and she had left his house, but later returned, and, in the presence of the person who had brought her back, told her husband that she would stay with him, if he would use her half white, and he received her coldly, not speaking or shaking hands, making no response to her offer to stay. On that occasion she asked him if she could send some things to her son by a former marriage, just married, and he told her she could not; that, if she took one thing away, she took all, and herself, too. She on that occasion said she was in danger of her life living with him, and was getting her satchel to go back with the party who brought her home, when the third party persuaded her to stay. There was other evidence tending to show

that he charged her with unfaithfulness, and felt bitter towards her. There had been a quarrel between them on the morning of the day on which she was found dead in the creek, as the prisoner admitted. This witness—Snyder—was allowed to say that he had seen her a short time before her death, hurrying down the road from his home, crying, and she said to him, "You don't know what I have to contend with;" that he had seen her a number of times, crying, at the house. When she was crying as she went down the road, and said to Snyder that he did not know what she had to contend with, Musgrave was in hearing, as he was standing in his yard, and she spoke in a loud tone. The point made against this is that Snyder was allowed to make this statement without showing the presence of the prisoner; but it was shown certainly sufficiently to go before the jury.

Complaint is made that evidence was given to show that he did not cry when he saw his wife lying dead, that he did not assist in efforts to resuscitate her, that he was restless during the examination of the body at the creek, that the prisoner wanted the coffin obtained and her buried by three o'clock next day. Personal conduct of the accused, evincive of his motives and of the workings of the inner man, are always received as evidence as bearing on his guilt. Lawson, Pres. Ev. 534; Starkie, Ev. 491, 494; *Dean* v. *Com.*, 32 Grat. 923.

It is said the court violated the rule against leading questions. A witness said that the prisoner, while in jail, would get up out of bed and awake him, and that his eyes would look like they would jump right at the witness, and prisoner would say that he could not sleep, that he was worried, there was something on his mind; and the witness was asked this question: "What did he say, if anything, at night, when he came to your bed, about murderers couldn't sleep?" which was answered: "Yes, he said that. He said, 'Murderers can't sleep, can't rest.'" In the first place, this is hardly a leading question. It only called the attention to the particular point on which inquiry was being made. *Hooper's Case*, 6 Grat. 684; *Cluverius' Case*, 81 Va. 787. And, in the second place, effort had been made to get the witness' mind on the particular point fruitlessly before this question was asked, and that warranted it. 1 Greenl. Ev. § 435.

I have thus at too great length, in deference to the able counsel of the prisoner and of the great gravity of the case, made reference to almost all, if not all, of the many matters involving questions of law made before us in the counsel's elaborate brief, without finding any error of law to justify a reversal of the conviction of the prisoner, which came of a notable trial beginning on the 13th and closing on the 26th of June. If we could say there was any misstep in matter of law in this long trial, it is one of very immaterial character, weighing not a feather in the trial, utterly inadequate to justify the reversal of a long, laborious trial bearing to us the face of having been full, patient, and fair. The scope of harmless error is, in these days, widening. Courts do not nowadays, even in grave trials, reverse such trials for trivial errors, evidently not affecting them; so light, and plainly playing so unimportant a part, as not to be appreciably influential or prejudicial when the whole trial, all in all, is regarded. In days gone by, technicalities and rigid procedure sprang up and were enforced to defend accused parties against the demand of monarchic power for conviction, and they then answered, good purpose; but in this country there is not the same need of them, as the danger now is that the guilty will go free, and something is necessary to protect the public against crime. The great press is declaiming against the courts for lax administration of criminal law. The New York World recently stated that statistics show that for ten years past only 2.20 *per cent.* of homicides have been punished, and that the people are afraid of the courts, and for quick justice resort to lynch law; and further says that this is attributable to the laxity and languor with which the law is enforced, the quibbles, subtleties, and technicalities of the courts fortressing criminals, and causing the administration of justice to appear a mere mockery. Such, I observe, is now almost the universal expression of the press. I would not overturn the solemn verdicts of juries rendered after fair trials, and approved by the trial court, unless I could see that on the whole case something substantially wronging the prisoner had been done. I would therefore affirm.

*Reversed.*